**ROEGELEIN PROVISION COMPANY et al., Appellants,**

v.

**Judy M. MAYEN et al., Appellees.**

No. 15798.

Court of Civil Appeals of Texas,
San Antonio.

Jan. 25, 1978.

3

Theo F. Weiss, Jack Hebdon, Thomas H. ·Crofts, Jr., Groce, Locke & Hebdon, San Antonio, for appellants.

A. J. Hohman, Jr., Hope, Henderson, Hohman & Georges, Lewin Plunkett, Wiley, Plunkett, Gibson & Allen, San Antonio, for appellees.

CADENA, Chief Justice.

Appellants, Roegelein Provision Company, a corporation, and its president, William Roegelein, Jr., complain of a judgment denying Roegelein Provision Company recovery in its suit against two former employees, Judy M. Mayen and her mother, Dorothy Mayen, for money allegedly stolen by them; denying Roegelein Provision Company recovery against Great American Insurance Company under an employees' fidelity bond issued by such company; and awarding Judy and Dorothy Mayen actual and exemplary damages as against Roegelein Provision Company and William Roegelein, Jr. for libel. The counterclaim for libel is based on statements contained in proofs of loss executed by William Roegelein, Jr., on behalf of Roegelein Provision Company, and filed with the insurance company in support of the claim under the employees' fidelity bond. The statements were to the effect the Roegelein Provision Company had suffered a loss of $55,500.00 as a result of fraudulent and dishonest acts on the part of Judy and Dorothy Mayen.

In this opinion Roegelein Provision Company and William Roegelein, Jr. will be referred to, collectively, as "appellants" and

individually, as "employer" and "Roegelein," respectively. Judy and Dorothy Mayen will be referred to collectively as "the Mayens" and individually, by their Christian names. Great American Insurance Company will be called "the bonding company."

The judgment is based on a jury verdict in which the issues relating to the liability of the Mayens and the bonding company were answered unfavorably to employer, while the issues referable to the counterclaim of the Mayens for libel were answered favorably to the Mayens.

Appellants' 33 points embody contentions to the effect that I. The trial court erred in rendering a take-nothing judgment against employer in its suit against the Mayens and the bonding company; II. the trial court erred in awarding the Mayens actual and exemplary damages for libel; and III. appellants were entitled to a new trial on the ground of newly discovered evidence.

A consideration of the questions involved in this case requires a recital of the evidence presented at the trial. The following 24 paragraphs contain what is believed to be a fair summary of such evidence.

1. Employer is engaged in the process of processing and selling meat and meat products to institutions such as schools, hospitals, and restaurants. It maintains three plants in San Antonio. Its main office is located on Brazos Street, with the other two plants being located on East Commerce Street and on Laredo Street. The events which gave rise to this litigation occurred, primarily, at the East Commerce street location, which will be referred to in this opinion as the "Commerce plant." The plant on Brazos Street will be identified as the "main office."

2. In October 1974, Edgar Taylor, secretary-treasurer of employer, noted what he considered to be an unusual drop in cash sales at the Commerce plant. He notified Roegelein, and on October 10, 1974, Roegelein and Taylor met with Wayne Wendell, a certified public accountant with the firm of Carneiro-Chumney & Co., an accounting firm which had audited employer's operations for a period of several years. At this time, Judy was employed as cashier at the Commerce plant and Dorothy was a saleswoman at such plant.

3. On October 11 Wendell conducted a "surprise" cash count at the Commerce plant. No discrepancies were revealed, but Wendell testified that during the progress of the cash count Judy appeared more nervous than usual and her mother, Dorothy, spent some time in the cashier's cage while the count was in progress. Subsequently, he admitted that it is not unusual for employees to be nervous when a check of their activities is being conducted. Dorothy denied that she was in the cashier's cage while the cash count was in progress.

4. The procedure followed in cases of cash sales, including cases where the customer paid by check at the time of delivery, was described in some detail by several witnesses, and there is no significant difference in the testimony relating to such procedure.

5. Orders, usually made by telephone, were taken by a person in employer's order department, located on the second floor of the Commerce plant. An invoice was prepared in quadruplicate, with each copy being a different color. The "original" was on green paper, and the other three copies were yellow, pink, and white.

6. All four copies of the invoice were then delivered to the "cooler," where the order was filled. The person or persons filling the order usually detached the white copy from the remainder of the invoice and entered on such white copy the weight of each item on the order. All four copies were then returned to the order department, where the weights and prices were noted on the green, pink, and yellow copies. The white copy, which generally became soiled in the process of filling the order, was then discarded.

7. After the weights and prices were entered on the remaining three copies, all three copies were sent to the cashier's cage. The green copy was immediately placed in a

"mail pouch" in the cashier's cage for transmittal to the main office. The pink and yellow copies remained in the cashier's cage. The mail pouch was picked up at least once a day by one of employer's drivers and delivered to the main office.

8. If the merchandise was to be delivered to the customer, such delivery was usually made on the day following receipt of the order. The foreman of the drivers usually arrived at the Commerce plant several hours before the cashier reported for work. He and his assistant occupied desks located in the cashier's cage. They would supervise the loading of the trucks and deliver the yellow and pink copies of the invoices to the drivers making the delivery of the orders described in the invoices. When the driver delivered the merchandise, he delivered the pink copy of the invoice to the customer, to be retained by the customer. The customer normally acknowledged receipt on the yellow copy, and the yellow copy was then returned by the driver to the cashier's cage, along with payment, in the form of either cash or check.

The cashier then checked the amounts turned in by each driver against the amount reflected on the yellow invoice and in the "driver's book," an ordinary stenographic pad in which had been entered the amount of each sale as reflected in the invoice. The entries in the driver's book were apparently made by persons in the order department. At the time of trial, the relevant driver's books could not be produced by employer.

9. If the customer was to call at the plant for the merchandise, the procedure differed only in the fact that when the customer appeared the cashier would notify the cooler, identifying the order by invoice number. When the meat was delivered to the customer, the cashier handed him the pink copy of the invoice, had him acknowledge receipt of the merchandise on the yellow copy, and retained the yellow copy, together with the check or cash handed her by the customer.

10. After the cashier checked the amount of money turned in by the truck drivers and paid by customers who picked up their orders, she made out a deposit slip and a deposit receipt which, along with the cash and checks, were picked up daily by an armored truck service. The yellow copies of the invoices were placed in the mail pouch for delivery to the main office.

11. Each invoice bore a number, with the green, yellow, and pink copies of each invoice bearing the same number. At its main office employer maintained a "checkerboard," designed to assure that a proper record of each invoice was kept. During the two months immediately preceding the inception of the investigation in October, this system, according to employer, had "broken down." Employer explained this breakdown by pointing out that the employee chiefly responsible for maintaining the checkerboard had been on vacation, although no satisfactory explanation was given for the failure to bring the checkerboard up-to-date after such employee had returned to work, other than the fact that keeping the checkerboard up-to-date was merely one of several duties performed by this employee.

12. The investigation, which was initiated by Wendell on October 11, 1974, continued until the end of that month. During this period Wendell and those working with him discovered that 244 invoices, covering the period from mid-July 1974, to mid-October 1974, were missing. Employer produced testimony to the effect that, normally, missing invoices averaged only two per month, but there is testimony to the effect that during the three months preceding the period during which the alleged losses occurred, 160 invoices were missing. Of these, 82 had been recorded as "void," although it was apparently not possible to verify whether such entries were correct.

13. Wendell suspended his investigation in November 1974, at which time a private investigator was hired by employer. The investigator, apparently looked into the matter for a period ending in April 1975, at which time Wendell resumed his investigation. The private investigator who was hired in November did not testify.

14. Wendell then requested employer's customers to check their records to determine whether the customers had the pink copies of the 244 missing invoices. As a result of such inquiries, 107 pink copies of the missing invoices were recovered from customers who were still in business and who had retained their copies of invoices. The face value of such recovered invoices was $22,934.72.

15. Wendell arrived at the amount of 137 missing invoices by averaging the value of the 107 pink copies recovered and multiplying that figure by 133. The figure of 133 was arrived at, according to Wendell, by assuming that the average monthly invoice lost was 2 invoices, and Wendell subtracted 8, which he assumed to be the average monthly figure, from 137. On the stand he admitted that an error in subtraction had been made, and that the average invoice amount should have been multiplied by 129 rather than 133. He also admitted that he had inaccurately added the sum of the recovered invoices to reach the figure $22,970.72, rather than $22,934.72. In any event, Wendell concluded that the missing invoices reflected cash sales amounting to $22,970.72. By adding this figure to the average amount of the 107 recovered pink copies, he concluded that the total loss amounted to $51,523.16. In his testimony Wendell admitted that, due to the mathematical errors referred to in this paragraph, his final estimate of the amount of loss was incorrect.

16. Wendell made another estimate of the amount of the loss by computing "inventory shrinkage." Assuming that the "normal" inventory shrinkage was 5%, he concluded that the inventory shrinkage during the three-month period in question exceeded the normal shrinkage of 5% by approximately $65,000.00.

17. From his investigations, Wendell concluded that the money representing sales reflected by the 244 missing invoices had found its way into the bank account of employer.

18. The bonding company produced the testimony of William Bradley, a certified public accountant. He described employer's record-keeping procedures as significantly less than adequate. He disputed the assertion that there had been a significant drop in cash sales at the Commerce plant during the period during which employer claimed the losses occurred. His conclusion was based on a comparison of the normal trend in seasonal ratio of cash sales to credit sales. He criticized the methods employed by Wendell, saying that the assumptions underlying Wendell's conclusions were false, and asserting that Wendell had not used proper procedures in his computation of inventory shrinkage. Since the period during which the losses allegedly occurred consisted of 55 working days, and since employer could produce only 35 daily balance sheets, he said that it was impossible to determine whether the money represented by the missing invoices had been deposited in employer's bank account or not. He pointed out that the problem was made worse by the fact that money from sources other than the Commerce plant was deposited in the same bank account.

19. The evidence showed that several persons, in addition to Judy, the drivers' foreman and his assistant and Dorothy, had access to the cashier's cage.

20. Judy and Dorothy left their employment with employer shortly after the investigation began, but there was evidence showing that they had decided to leave some time prior to the time the investigation began.

21. The evidence showed that Judy Mayen had made cash purchases totalling more than $8,000.00 beginning in July 1974, although she had not worked since she left her employment. She explained this by saying that she had received from $8,000.00 to $10,000.00 from a gentleman whom she had met in Mexico and with whom she occasionally spent weekends over a period of months. She described this relationship as being entirely platonic. She also testified that she received $3,000.00 from her mother. Her mother, Dorothy, testified that she had given Judy $3,000.00. Judy's grandmother, Mrs. Michie, testified that she

gave Judy cash from time to time, and that during 1974 she had given Judy $1,500.00 or $2,500.00. She testified that her income in 1974 was $4,100.00. Judy also received a check from an insurance company in the sum of $2,600.00.

22. The evidence established that Dorothy had made cash purchases totalling $9,268.60. She testified that she had received a cashier's check in the sum of $3,500.00 from her mother and produced a copy of the cashier's check. She stated that she had sold some furniture for $4,200.00, and introduced copies of newspaper advertisements seeking buyers for such furniture. She received $900.00 from an insurance company as a result of the theft of her automobile, and she testified that she was living with a married man who, nevertheless, supported her.

23. Mrs. Michie, grandmother of Judy and mother of Dorothy, testified that, in addition to her annual income, she had received $15,000.00 from what she called the "Houston settlement" ($10,000.00) and benefits when she retired from her employment with a furniture store ($5,000.00).

24. Both Judy and Dorothy categorically denied taking any money from employer.

## I. THE TAKE–NOTHING JUDGMENT AGAINST EMPLOYER

The issues relating to employer's claims against the Mayens and the bonding company inquired whether the jury found from a preponderance of the evidence that (1) employer had suffered a loss as the result of fraudulent and dishonest acts on the part of Judy (Issue No. 1); (2) employer had suffered any loss as a result of fraudulent and dishonest acts on the part of Dorothy (Issue No. 3); (3) employer had suffered any loss as the result of fraudulent and dishonest acts of Judy and Dorothy acting together (Issue No. 5); (4) employer had suffered any loss as the result of fraudulent and dishonest acts of any employee other than the Mayens (Issue No. 7); (5) employer gave notice to the bonding company as soon as practicable upon knowledge or discovery of loss or of an occurrence which might give

rise to a claim for loss (Issue No. 9); (6) employer filed detailed proofs of loss duly sworn to with the bonding company within 100 days after discovery of the loss (Issue No. 10); (7) the bonding company was not prejudiced by the timing of the notice to it or the filing of the proofs of loss at the time such proofs were filed (Issue No. 11); (8) the bonding company waived the requirements of the "insurance policy" concerning the giving of notice and filing of proofs of loss (Issue No. 12). To each of these issues the jury answered, "We do not."

Employer's points 25, 26, 27, 28, 30, 31, 32 and 33 assert that the jury's answers to issues 1, 3, 5, 7, 9, 10, 11, and 12 are contrary to the overwhelming weight and preponderance of the evidence.

 In view of the evidence previously summarized, we are not free to disturb the answers to issues 1, 3, and 5 concerning loss as a result of fraudulent and dishonest acts of the Mayens acting singly or in concert. Assuming that the evidence produced by employer would have supported an affirmative answer to such issues, it must be concluded that the denial of wrongdoing by the Mayens and the testimony of Bradley, the accountant placed on the stand by the bonding company, cast sufficient doubt on the methods used by employer's accountant and the adequacy of employer's record-keeping procedures to justify a refusal to believe the testimony offered by employer. All of the evidence pointing to the guilt of Judy and Dorothy, including the testimony concerning cash purchases by them, is purely circumstantial, and it cannot be said that the jury's refusal to draw from such circumstances inferences favorable to employer's claim is manifestly unfair. It is apparent that the jury chose to accept as true the explanations given by Judy and Dorothy, despite employer's suggestion in its brief that Judy's testimony concerning the generosity of her Mexican benefactor strains credulity. Even if Judy's explanation is disbelieved, the jury was justified in concluding that, whatever the source of Judy's affluence, employer had not established that she had stolen money from employer.

■ The evidence is also such as to support the jury's conclusion that employer had not established, by a preponderance of the evidence, that it had lost any money as the result of fraudulent and dishonest acts of any employee. Bradley's testimony standing alone, cast such doubt on the accuracy of the conclusions drawn from the circumstances by employer's witnesses as to justify the jury's refusal to accept the testimony of employer's witnesses, including the conclusions drawn by such witnesses, as true.

Employer's points 25, 26, 27, and 28, contending that the answers to Issues 1, 3, 5, and 7 are contrary to the overwhelming weight and preponderance of the evidence, are without merit.

■ Since we have concluded that the jury's refusal to find that employer suffered a monetary loss as the result of fraudulent and dishonest acts of the Mayens or other employees cannot be disregarded, it becomes unnecessary to consider points 30, 31, 32, and 33, in which employer argues that the answers to Issues 9, 10, 11, and 12 cannot stand under the evidence in this case. If employer suffered no loss compensable under the employees' fidelity bond, whether employee timely gave notice or timely filed proofs of loss, and whether the bonding company waived the requirements concerning the giving of notice and filing of proofs of loss become irrelevant questions. Even if Issues 9, 10, 11, and 12 had been answered favorably to employer, such answers would not support a judgment in favor of employer against the bonding company in view of the employer's failure to secure a finding that it had suffered a loss covered by the fidelity bond. If the jury's answers to such four issues be erroneous, the error is harmless.

## II. THE LIBEL ACTION

Twenty-four of appellants' points attack that portion of the judgment which awards the Mayens actual and exemplary damages for libel. These points present the following contentions:

A. There is no finding that the defamatory statements are false, and the evidence is legally and factually insufficient to support findings of the existence of the elements of libel. (Points 16, 17, and 18)

B. The statements were privileged and there is no evidence or, in the alternative, the evidence is insufficient, to establish the existence of facts sufficient to defeat the privilege. (Points 1, 2, 3, 4, 5, and 19)

C. The evidence is legally and factually insufficient to support the awards of actual damages, and the awards of actual damages are excessive. (Points 6, 7, 8, 9, 20 and 21)

D. The awards of actual damages are erroneous because (1) exemplary damages cannot be awarded in the absence of actual damages; (2) there can be no award of exemplary damages in a case where the defamatory statements are conditionally privileged; (3) the evidence is legally and factually insufficient to support findings giving the Mayens the right to recover exemplary damages; (4) the awards of exemplary damages are excessive; and (5) the trial court erred in admitting testimony of mental anguish, humiliation, etc. suffered by Dorothy because of the allegations contained in appellants' pleadings. (Points 10, 11, 12, 13, 14, 15, 22, 23, and 24)

### A. Falsity of Defamatory Statements

For the purpose of this discussion we assume that, as the result of a series of decisions by the Supreme Court of the United States, beginning with *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a person who seeks recovery for defamation has the burden of proving that the defamatory statement is false. The Mayens do not contend otherwise.

■ The answers to Issues 1, 3, and 5, submitted in connection with employer's claim against the Mayens, do no more than establish that employer failed to prove, by a preponderance of the evidence, that it had suffered a loss as a result of fraudulent and dishonest acts on the part of the Mayens. Such negative answers, therefore, do not constitute affirmative findings that the

statements concerning the Mayens, which are contained in the proofs of loss filed by employer, are false.

■ However, in answer to Issue 16, the jury found that the statements were made with knowledge that such statements were false or with reckless disregard of whether they were false or not. This issue properly placed the burden of proof on the Mayens, and it is clear that the issue was submitted in connection with the Mayens' counterclaim for libel. Issue 16, therefore, is clearly referable to the only ground of recovery alleged by the Mayens. We thus have a case in which at least one issue necessary to sustain recovery for libel was submitted to, and answered by, the jury. Since appellants neither requested the submission of the omitted issues pertinent to that ground of recovery nor objected to the court's failure to submit such additional issues, we must presume that the omitted issues were found by the court in such manner as will support the judgment in favor of the Mayens, if there is evidence to support such finding. Rule 279, Tex.R.Civ.P. (1977).

■ The evidence we have outlined in connection with the sufficiency of the evidence to support the answers to Issues 1, 3, and 5 is sufficient to support the implied finding that the statements are false. (Points 16, 17, and 18)

### B. The Question of Privilege

Appellants assert, and the Mayens do not contend otherwise, that the statements contained in the proofs of loss were made under circumstances giving rise to a conditional or qualified privilege under applicable common law rules. See generally 36 Tex.Jur.2d, Libel and Slander § 571 (1962); Restatement, Torts (2d), §§ 594–598(A) (1976).

The parties also agree that in a libel action the defense of conditional privilege will be overcome if plaintiff proves that defendant was guilty of "malice." However, the parties disagree concerning the meaning of "malice" and the sufficiency of the evidence to support a finding of malice.

In *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 900–901 (Tex.1970), the Supreme Court of this State, after pointing out that the defense of common law conditional privileges (referred to in subsequent portions of this opinion as simply "conditional privilege") can be overcome only by a showing of "actual malice," defined that in language requiring a showing that the defamatory statement was made with knowledge that it was false or with willful disregard of whether it was false or not. The *O'Neil* opinion expressly holds that, insofar as the definition of malice is concerned, the rules applicable in cases involving the common law conditional privilege (referred to in subsequent portions of this opinion as "conditional privilege") are the same as those adopted by the Supreme Court of the United States in *New York Times Co., supra*, and applied by the Supreme Court of Texas in *El Paso Times v. Trexler*, 447 S.W.2d 403 (1969) in cases involving constitutional conditional privileges (referred to in subsequent portions of this opinion as "constitutional privilege").

The *New York Times Co.* doctrine, which requires a showing of knowledge of falsity or reckless disregard of truth in order to overcome the defense of constitutional privilege, was announced in a case in which the plaintiff was an elected official. Three years later, the same standard was applied to cases involving "public figures." *Curtis Publishing Co. v. Butts* and *Associated Press v. Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The Mayens are not public officials. Nor can it be said that the Mayens are "public figures," even if we accept the definition of public figure advanced in the plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), which if not repudiated in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), cannot now be accepted as authoritative in view of the decision in *Time, Inc. v. Firestone*, 424 U.S. 448 (1976).

The Mayens must be classified as "private persons" or "private plaintiffs," so that the applicable rules are those an-

nounced in *Gertz* and *Firestone*. Unfortunately, the terms private person or private plaintiff can be defined only negatively and, probably tautologically, in terms of a person who is neither a public official or a public figure.

In *Gertz*, the plurality opinion by Justice Powell contains the following language: "We hold that, *so long as they do not impose liability without fault*, these States may define for themselves the appropriate standard of liability for a *publisher or broadcaster* of defamatory falsehood injurious to a private individual." 418 U.S. at 347, 94 S.Ct. at 3010 (emphasis added).

The qualified manner in which Justice Blackmun joined in the opinion of the Gertz plurality may cast some doubt on the question of majority acceptance of the language of the plurality opinion quoted in the preceding paragraph, but much, if not all, of such doubt disappears in view of the decision in *Firestone*.

In *O'Neil*, the Texas Supreme Court explained its refusal to distinguish between cases involving a conditional privilege and those involving a constitutional privilege as follows (456 S.W.2d at 900):

> The *New York Times* definition of actual malice which this Court applied in *El Paso Times* is likewise applicable in the instant case, all three cases being libel suits, all three cases involving publishers' privileges and all three cases requiring malice to overcome the privileges. Insofar as the definition of actual malice is concerned we do not think the instant case involving a conditional privilege is distinguishable from the *New York Times* and *El Paso Times* cases which involve First Amendment Constitutional privileges.

■ In *O'Neil*, the plaintiff was a private individual, rather than a public official or a public figure. *O'Neil* was decided prior to *Gertz* and *Firestone* and, apparently, it was assumed that the rules applicable to the defense of constitutional privilege were the same irrespective of the classification of the plaintiff. It now appears that where, as here, the plaintiff is a private individual and, as here, the substance of the defamatory statement makes substantial danger to reputation apparent (418 U.S. at 348, 94 S.Ct. 2997), the First Amendment does not impose a showing of knowledge of falsity or wilful disregard of truth as a condition precedent to recovery for libel. It is now clear that *O'Neil* is, in fact, clearly distinguishable from *New York Times* and *El Paso Times*. The result is that if the *O'Neil* opinion is interpreted as holding that plaintiff's burden in a conditional privilege case is the same as plaintiff's burden in a constitutional privilege case, *New York Times* is clearly inapplicable and the problem is one of determining whether *Gertz* and *Firestone* are applicable.

The conclusion that *O'Neil* could not be distinguished from *New York Times* and *El Paso Times* was based on the fact that all three cases involved "publishers' privileges" which could be overcome only by a showing of malice. The characterization of the *O'Neil* defendant as a "publisher" creates some difficulty.

In the law of libel a "publisher" is one who makes a libel known to any person other than the person defamed. The use of the term "publishers" in *O'Neil*, however, cannot be given this restricted meaning, since the Texas Court was attempting to show that it was dealing with a "publisher" in the sense that *New York Times* and *El Paso Times* dealt with publishers. To adopt the restrictive definition would amount to saying that all libel cases are indistinguishable because all libel cases necessarily have "publishers" as defendants. On the other hand, it is not easy to accept the notion that Dun & Bradstreet, a mercantile credit reporting agency which disseminates credit information to a rather restricted clientele, cannot be differentiated from a person or organization which publishes newspapers for the dissemination of information to the public in general. Stated differently, it cannot be categorically asserted that the rule formulated in *Gertz* and *Firestone* as applicable to cases where plaintiff is a private individual seeking recovery from "publishers and broadcasters" is applicable to

cases where the defendant is one who publishes credit information reports.

Apparently, the only decision by the Supreme Court of Texas after the *Gertz* and *Firestone* decisions is *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (1976), in which it appears that the only defense was that of constitutional privilege. There, the Court said: "We hold that a private individual may recover damages from a *publisher or broadcaster* of a defamatory falsehood as compensation for actual injury upon a showing that the publisher or broadcaster knew or should have known that the defamatory statement was false. * * * The negligence standard of liability coupled with the 'actual injury' requirement established in *Gertz* provides a useful beginning point for the development of constitutional defamation law and has the capability of achieving a fair balance between the competing interests at stake." 541 S.W.2d at 819–820.

Legal commentators are in disagreement as to whether *Gertz* is applicable to a case involving a private defamation of a private plaintiff by a "nonmedia defendant." *Cf.,* e.g., Brosnahan, From *Times v. Sullivan* to *Gertz v. Welch*: Ten Years of Balancing Libel Law and the First Amendment, 26 Hastings L.J. 777, 792–793 (1975), and Hill, Defamation and Privacy Under the First Amendment, 76 Colum.L.Rev. 1205, 1226–1227 (1976). Post-*Gertz* reflect a similar lack of harmony. In *Grenya v. George Washington University*, 512 F.2d 556 (D.C. Cir.1975), the court applied common law principles without mentioning *Gertz*. But in *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 350 A.2d 688 (1976), the court held that the *Gertz* requirement of fault was applicable in all cases in which a private plaintiff seeks recovery for libel, irrespective of the status of defendant. It can probably be said that the majority of cases, not necessarily representing the "weight of authority," have been decided on the basis of common law rules, rather than by application of the standards enunciated in *Gertz* and *Firestone*. Robertson, Defamation and the First Amendment: In Praise of *Gertz v. Robert Welch, Inc.*, 54 Texas L.Rev. 199, 217 (1976).

We need not here determine the proper standard to be applied to this case. It is readily apparent that the case was tried on the theory that the defense of conditional privilege could be overcome only by a showing of knowledge of falsity or reckless disregard of truth. This Court should not reverse on the theory that a different standard was, in fact, applicable.

There is no evidence which suggests that the defamatory statements were made with knowledge of their falsity. We must, therefore, determine whether there is evidence to support the finding that the statements were made with reckless disregard of whether they were false or not.

In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1976), it was said that in order to meet the *New York Times* standard, there must be sufficient evidence to permit the conclusion that the person making the defamatory statement in fact entertained serious doubts as to the truth of the statement, and that publication of the statement with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

There is no evidence to support a finding that appellants entertained serious doubts as to the truth of the statements made in the proof of loss. One of the officers of employer testified that, to his knowledge, no loss had occurred during the period in question. This testimony clearly had reference to the knowledge of such officer prior to the investigation, and there is no evidence to indicate that, after he became aware of the results of the investigation, this witness had any doubts concerning the existence of a loss. In fact, there is no evidence to indicate that this officer knew of the results of the investigation. According to the brief of the Mayens, another officer "questioned" whether a loss of such a "staggering amount" could have occurred over such a short period of time. The evidence affirmatively establishes that this officer was not privy to the results of the investigation and, in any event, he ques-

tioned only the amount of the loss, and not the fact that employer had suffered a loss as a result of the acts of the Mayens. There is no evidence that any officer of employer who had knowledge of the result of the investigation entertained any doubt concerning the guilt of the Mayens.

If it be assumed that the applicable standard is that announced by the Texas Supreme Court in *Foster*, so that the defense of conditional privilege is defeated by a showing of negligence based on the fact that appellants knew or should have known that the statements were false, there is no evidence to support a finding of such negligence. As already pointed out, there is no evidence that appellants knew the statement was false.

All of the evidence establishes conclusively that the statements were made only after an expensive investigation extending over several months. The proofs of loss were filed after receipt of the conclusions of an independent certified public accountant, and apparently, after receipt of knowledge of the unusual cash purchases made by the Mayens. There is no evidence indicating the existence of circumstances which would have prompted a reasonable person to question the conclusions drawn by the independent auditor. The fact that two certified public accountants reached different conclusions is not evidence of negligence on the part of defendants, since at the time appellants received the report of their auditor the second "expert" had not initiated his investigations and appellants were completely unaware of the difference of opinion between the two. The Mayens insist that appellants should have known that the average number of invoices "lost" per month was ten, rather than two, so that appellants should have known that the conclusions drawn by their expert were based on inaccurate data. Even if the correct figure was, in fact, ten, rather than two, the amount of "lost" invoices during the period in question was abnormally large to a significant degree, and the mistake affected only the amount of the loss, without indicating that the conclusion concerning the existence of a loss was false.

The theory most favorable to the Mayens is that in this case neither *New York Times, Gertz,* or *Foster* is applicable, and that the defense of conditional privilege yields to a showing that the defamer was motivated by personal ill will or animosity toward the plaintiff. *Stearns v. McManis,* 543 S.W.2d 659, 666 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ). We find no evidence that the statements contained in the proofs of loss were made as a result of such ill will or animosity.

Dorothy Mayen testified that "in the last few years" Roegelein did not speak to her at sales meetings. She also testified that during the last few years, when the yearly bonuses were given to employees, Roegelein would merely hand her her check without speaking to her or offering a congratulatory handshake, although a handshake and words of congratulation were customarily exchanged between Roegelein and the employee receiving the bonus check.

The evidence establishes that during the five or six years preceding the events giving rise to this lawsuit, Dorothy had less than an outstanding record as a salesperson and, consequently, she had received no bonus. The brief of the Mayens fails to call our attention to any evidence to the effect that Roegelein made a practice of engaging in personal conversation with any of the salespersons at the sales meeting.

There is no evidence whatever of any failure of Roegelein to treat Judy in the manner he treated other employees.

The Mayens assert that personal animosity is shown by the fact that, although the fidelity bond covered losses resulting from dishonest and fraudulent acts of unidentified employees, the proof of loss nevertheless contained the statements that Judy and Dorothy were guilty of fraudulent and dishonest acts resulting in loss to employer. The proof of loss furnished employer by the bonding company contains blanks in which the employer is to insert the names of the employees suspected of

causing the loss. The fact that the proof of loss was properly filled out in order to give the information called for by the form is no evidence of ill will.

Nor does the fact that employer filed suit against the Mayens support a finding of personal animosity.

The contention that the accusations against the Mayens were made for the purpose of embarrassing one of employer's officers is certainly no evidence of animosity or ill will toward the Mayens.

The evidence shows that employer's attorney called at the office of the district attorney and, without giving names, outlined the results of the investigation and sought an opinion concerning the possibility of an indictment. Even if the Mayens had been named as the suspect wrongdoers, the report of a suspected crime to proper authorities is conditionally privileged. It would be preposterous to hold that the making of a conditionally privileged communication is, of itself, evidence of malice.

The statements made in appellants' pleadings were absolutely privileged and cannot be made the basis for imposing liability in the absence of showing that the statements were made with no reasonable basis for believing them to be true.

We do not agree that the fact that employer spent a considerable amount of money in the investigation of the suspected loss is evidence of ill will toward the Mayens. The purpose of the investigation was to determine if a loss had occurred and, if so, who was responsible. There is no evidence suggesting that the purpose of the investigation was to "get" the Mayens. To hold that the expenditure of money in investigation is evidence of ill will could but result in discouraging investigation prior to the making of an accusation.

Since we have held that there is no evidence to support findings which would defeat the conditional privilege, it would serve no useful purpose to consider appellants' points concerning admissibility of evidence, the sufficiency of the evidence to support the awards of exemplary and actual damages and the excessiveness of the damage awards.

## III. NEWLY DISCOVERED EVIDENCE

In view of our holding that the judgment in favor of the Mayens cannot stand, the question of whether appellants were entitled to a new trial on the question of their liability for libel becomes irrelevant.

The claimed newly discovered evidence related to evidence of additional cash purchases made by the Mayens. This evidence could be relevant only on the issue of whether the Mayens had stolen money from employer. Evidence that the Mayens had been living beyond their apparent means was introduced during the trial. The claimed newly discovered evidence was, therefore, merely cumulative of that presented at the trial, and the trial court did not abuse its discretion in overruling the motion for new trial.

That portion of the judgment denying Roegelein Provision Company recovery against Judy and Dorothy Mayen is affirmed, as is that portion of the judgment denying Roegelein Provision Company recovery against Great American Insurance Company. That portion of the judgment awarding Judy Mayen and Dorothy Mayen damages for libel against Roegelein Provision Company and William R. Roegelein, Jr., is reversed and judgment is here rendered that Judy Mayen and Dorothy Mayen take nothing.

Roegelein Provision Company shall pay one-half of the costs of this appeal and Judy Mayen and Dorothy Mayen shall each pay one-fourth of such costs.