SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,

v.

Oleta Gravitt DIXON, Individually and as Executrix of the Estate of T. O. Gravitt, and James H. Ashley, Appellees.

No. 16025.

Court of Civil Appeals of Texas, San Antonio.

Nov. 29, 1978.

Rehearing Denied Jan. 10, 1979.

Hubert W. Green, Jack Hebdon, James E. Barden, San Antonio, Wayne E. Babler, St. Louis, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for appellant.

Pat Maloney, Jack Pasqual, San Antonio, for appellees.

## OPINION

MURRAY, Justice.

Appellees brought this suit against defendant for tortiously injuring two former Southwestern Bell management employees, James Ashley and T. O. Gravitt. Appellees alleged that appellant conspired against them, defamed them orally and in writing, invaded their privacy and subjected them to economic duress, and that these acts were the cause of the wrongful death of T. O. Gravitt.

The trial court entered judgment on the jury verdict in which the issues relating to the liability of the appellant for slander were answered favorably to appellees. The judgment awarded $500,000 to Oleta Gravitt Dixon as actual damages for slander allegedly suffered by T. O. Gravitt before his death, $500,000 damages for wrongful death allegedly caused by the slander, and $500,000 exemplary damages. James Ashley was awarded $1,000,000 actual damages for slander and $500,000 exemplary damages. Defendant's motion non obstante veredicto and amended motion for new trial were overruled by the trial court. Defendant has duly perfected an appeal to this Court.

The statement of facts in this case contains over 5,000 pages and the following is what we believe to be a fair summary of the testimony pertaining to the cause of action for slander. In the summer of 1974, a secretary in the San Antonio security department of Southwestern Bell notified a security supervisor in the San Antonio office that she had heard about widespread sexual and financial irregularities occurring in the commercial department headed by James H. Ashley. She reported her belief that Ashley was promiscuous with a number of subordinate women employees and that Ashley and Mr. T. O. Gravitt, then Southwestern Bell's vice president—Texas, had an interest in the printing firm of Quik Print to which they were directing Southwestern Bell's business. These reports were eventually reported to Mr. G. A. Larkin, the head of the company's security

department. Larkin brought these reports to the attention of Southwestern Bell's vice president—Operations, L. C. Bailey, but nothing was done. When the reports persisted during the summer of 1974, Bailey asked Larkin to have some discreet inquiries made about the reported improprieties. Larkin directed Edwin McKaskel, who was the Southwestern Bell security manager in Kansas City, Missouri, to go to San Antonio to carry out this task.

McKaskel began this inquiry by interviewing the secretary in the San Antonio security department of Southwestern Bell. She reported that numerous women who had had affairs with Ashley had been promoted. She also reported that Gravitt had taken her to an apartment rented by the owner of Quik Print, the Kansas City based printing firm. On this occasion, Gravitt asked her about her future in the company and then took her into the bedroom and asked her to "try the bed." When she declined his advances, he attempted to fondle her bosom. McKaskel, following leads given by this secretary, interviewed other female employees who confirmed many of the allegations.

When Bailey learned the result of these inquiries, he conferred with other company officers, and they decided that an investigation was necessary to determine the facts. Before it began, Larkin, who personally directed the investigation, warned the investigators that measures should be taken to prevent embarrassment and he cautioned them about the need for confidentiality and discretion. Bailey informed C. L. Todd, Ashley's immediate supervisor, of the planned investigation and directed Todd to suspend Ashley pending the outcome of the investigation.

Only employees of appellant were interviewed by investigators, and these employees were asked about their knowledge of any improprieties within the company. As leads developed, they were systematically followed. Each employee interviewed was told that the investigation was confidential and they were not to discuss the interview with anyone. The employees who were called as witnesses at the trial testified that their interview was discreetly conducted.

We believe that the information received as a result of the investigation would reasonably indicate to appellant that Ashley and Gravitt had been promiscuous with subordinate employees, that there was an apparent conflict of interest involving Quik Print, and that Ashley and Gravitt submitted false claims for reimbursements for purportedly business related expenditures.

Prior to and during the investigation, Ashley and Gravitt had been openly critical of appellant because of rate fixing, improper vouchering, kickbacks, and political contributions.

This summation of the evidence is only intended to make clear the questions which are considered and discussed in the opinion; it is not given as a full and accurate detailed statement of all the facts appearing in the record. We have, however, stated all the facts we regard as material to a proper understanding and disposition of the questions arising in this case.

The judgment in favor of Gravitt was based on findings of defamatory statements made by defendant, through its agent, concerning sexual promiscuity and conflict of interest with Quik Print. The judgment in favor of Ashley was based on findings of defamatory statements made by defendant, through its agent, concerning sexual promiscuity, false vouchering, and conflict of interest with Quik Print.

The pertinent jury findings were as follows:

(1) Defendant slandered T. O Gravitt during his lifetime as to sexual promiscuity and conflict of interest with Quik Print;

(2) Such slander of T. O. Gravitt was published with knowledge or reckless disregard of its falsity;

(3) T. O. Gravitt's compensatory damages were $500,000;

(4) Defendant's slander of T. O. Gravitt was the proximate cause of his insanity which made it impossible for him to resist an impulse to take his own life;

(5) Oleta Gravitt Dixon's compensatory damages for the death of T. O. Gravitt were $500,000;

(6) Exemplary damages to Oleta Gravitt Dixon were $500,000;

(7) Defendant slandered James H. Ashley as to sexual promiscuity, false vouchering, and conflict of interest in Quik Print;

(8) James H. Ashley's compensatory damages were $1,000,000;

(9) Exemplary damages for James H. Ashley were $500,000;

(10) The jury refused to find that defendant had a business interest in the slander of T. O. Gravitt and that such utterances were made in good faith;

(11) The jury refused to find that defendant had a business interest in the slander of James H. Ashley and that such utterances were made in good faith.

Defendant has stated and briefed 112 points of error stating why the trial court's judgment should be reversed. Basically, defendant contends that:

(A) The investigation of misconduct was privileged as a matter of law and there is no evidence to establish the existence of facts sufficient to defeat the privilege;

(B) There were deficiencies in the plaintiff's pleadings;

(C) There was error in the trial court's instructions and special issues;

(D) There was no evidence or in the alternative insufficient evidence of the necessary elements of slander;

(E) Improper jury argument and side bar remarks were made by plaintiffs' attorney;

(F) Defendant's motion for change of venue should have been granted.

■ We agree with appellant that the report of wrongdoing establishes defendant's conditional privilege to make inquiries or investigations in order to preserve its own effectiveness. Defendant made inquiries only after it had received reports which related to serious wrongdoings. Any reasonable employer would investigate such reports in order to preserve its own effectiveness. There is nothing in the record of this case to indicate that the reports of wrongdoings were not in fact received by the defendant. Under such circumstances, defendant's conditional privilege arises as a matter of law. *Reagan v. Guardian Life Insurance Co.*, 140 Tex. 105, 166 S.W.2d 909 (1942); *Roegelein Provision Co. v. Mayen*, 566 S.W.2d 1 (Tex.Civ.App.—San Antonio 1978, writ ref'd n. r. e.); *Mayfield v. Gleichert*, 484 S.W.2d 619 (Tex.Civ.App.—Tyler 1972, no writ); *Bridges v. Farmer*, 483 S.W.2d 939 (Tex.Civ.App.—Waco 1972, no writ). In *Reagan*, the jury found in answer to a special issue that a forged and false instrument filed with the Board of Insurance Commissioners was not privileged. In holding that the question of conditional privilege is a question of law, the Supreme Court stated, "Of course, the findings of the jury that the instrument was not privileged or conditionally privileged were findings on pure questions of law. They are, therefore, of no effect." 140 Tex. at 109, 166 S.W.2d at 912.

■ The law is well settled that once a conditional privilege is established it may be lost by a showing of "malice" and the burden is on the plaintiff to show malice. *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex.1976); *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970); *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (Tex. 1969); *Roegelein Provision Co. v. Mayen*, 566 S.W.2d 1 (Tex.Civ.App.—San Antonio 1978, writ ref'd n. r. e.). In *Dun and Bradstreet, Inc. v. O'Neil*, a credit reporting agency erroneously advised certain of its subscribers that the plaintiff had filed a voluntary petition of bankruptcy. The Supreme Court held that there was a conditional privilege as a matter of law and said:

The Court of Civil Appeals stated that plaintiff had been libeled as a matter of law, that defendant relied upon a conditional privilege as a defense, that a credit reporting agency is entitled to a conditional privilege if certain requirements

are met, and that once the conditional privilege is shown to exist the burden is on the plaintiff to show that the privilege is lost, that is, plaintiff must then show actual malice. We are in agreement with these statements.

456 S.W.2d at 898. The Supreme Court also held that actual malice was shown when defendant acted "with knowledge that it was false or with reckless disregard of whether it was false or not"[1] *Id.* at 901. In order to apply this standard, the Supreme Court of Texas treated Dun and Bradstreet as a media defendant the same as the ones involved in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403 (1969). Consequently, the defamation suit in *O'Neil* could be categorized as a private individual suing a media defendant. In light of this categorization and the decision in *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809 (Tex. 1976), which adopted the negligence standard in Texas for defamation actions instituted by private individuals against media defendants, it is uncertain whether the definition of malice in *O'Neil* is still the proper standard to apply in such a case.

This suit, however, involves a defamation action instituted by private individuals (Ashley and Gravitt) against a nonmedia defendant (Southwestern Bell). Since *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the proper standard to be applied in this case is unclear. Legal commentators are in disagreement as to whether *Gertz* is applicable to a case involving defamation of a private plaintiff by a nonmedia defendant. *Compare* Brosnaham, *From Times v. Sullivan to Gertz v. Welch: Ten Years of Balancing Libel Law and The First Amendment*, 26 Hastings L.J. 777, 792–793 (1975) [*and*] Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 Texas L.Rev. 199, 215–220 (1976) *with* Hill, *Defamation and Privacy Under the First Amendment, 76 Colum.L.*

Rev. 1205, 1221–1227 (1976) [*and*] Frakt, *The Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc., and Beyond, 6 Rut.-Cam. L.J.* 471, 509–512 (1975). In this case, however, as in *Roegelein Provision Co.*, we need not determine the proper standard to be applied because the trial court submitted the *New York Times* standard without objection from either party.

In the present case, the trial court defined in its instructions and definitions both common law malice and actual malice. These definitions were as follows:

## MALICE AND ACTUAL MALICE

MALICE means ill will, bad or evil motive, or such gross indifference to the rights of others as amounts to wilful or wanton disregard of the rights of others.

You are instructed that a corporation can act with malice only if the malicious act is committed by one under circumstances where his act is the act of the corporation or whose act was previously authorized or subsequently ratified by the corporation.

ACTUAL MALICE means that the statement was made with knowledge that the statement was false or with a reckless disregard for the truth. Further, you are instructed that reckless disregard for the truth means that the statement was made with a high degree of awareness of the probable falsity of the statement.

The questions on malice submitted by the trial court without objection from the appellees were as follows:

## QUESTION NO. 3

Was the slander published, if it was, by the Defendant, Southwestern Bell Telephone Company, during the lifetime of T. O. Gravitt, with the knowledge that it was false or with reckless disregard of whether it was false or not?

---

1. This standard was first enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and is hereafter referred to as the *New York Times* standard.

## QUESTION NO. 18

Was the slander of Plaintiff, James H. Ashley, published, if it was, by the Defendant, Southwestern Bell Telephone Company, with the knowledge that it was false or with reckless disregard of whether it was false or not?

The terms "malice" and "actual malice" were not used in the special issues pertaining to appellees' cause of action for slander.

■ It is apparent that the case was submitted to the jury on the theory that the defense of conditional privilege could be overcome only by a showing of knowledge of falsity or with reckless disregard of whether it was false or not. No issue was submitted to the jury or requested by appellees on the question of common law malice in relation to the slander cause of action. We have carefully examined the record in this case for any evidence showing that the appellant interrogated its employees concerning the reports of misconduct with actual knowledge that the reports were false or with reckless disregard of whether the reports were false or not. There is no evidence of probative value upon this issue. We think that the circumstances under which the investigation was conducted present a case of conditional privilege unaccompanied by any circumstances tending to show actual malice on defendant's part.

Appellees argue that the conditional privilege character of the interrogation was destroyed because the occasion was used for the unlawful purpose of defaming and injuring the appellees, rather than making a bona fide inquiry into the reports of wrongdoing. Appellees rely upon the fact that their complaints of wrongdoing by the appellant in its rate-making structure, kickbacks, improper vouchering, and political contributions, caused indignation and resentment on the part of appellant and was the motivating cause for the defamation. On the record before us, such inferences could be based upon nothing more than suspicion. There is no testimony which would directly justify the inference appellees seek to have this court draw from the complaints made by Ashley and Gravitt.

Such an inference would mean that an employer could never investigate an employee who had previously criticized his employer.

This case is clearly one of conditional privilege and there is no evidence of malice or improper motive; therefore, it is not necessary that we consider the other points raised by appellant.

Ashley alleges in his only cross-point that the trial court erred in failing to include in the charge to the jury Ashley's tendered issue of wrongful discharge.

■ In the absence of contractual limitations, the employer has the authority to discharge an employee with or without cause. 38 Tex.Jur.2d *Master and Servant* § 12 (1962); *See Horn v. Builders Supply Co. of Longview*, 401 S.W.2d 143 (Tex.Civ. App.—Tyler 1966, writ ref'd n. r. e.). The basic rule was stated by the Supreme Court in the early case of *East Line & R. R. R. Co. v. Scott*, 72 Tex. 70, 75, 10 S.W. 99, 102 (1888), as follows: "It is very generally, if not uniformly, held, when the term of service is left to the discretion of either party, or the term left indefinite, or determinable by either party, that either may put an end to it at will, and so without cause."

■ Ashley insists that his contract of employment with appellant was for as long as he satisfactorily performed his duties; thus, he could not be discharged without just cause while he performed satisfactorily. To support this contention, Ashley cites the case of *Hardison v. A. H. Belo Corp.*, 247 S.W.2d 167 (Tex.Civ.App.—Dallas 1952, no writ). *Hardison* holds that in the event there is an agreement whereby the employee would be employed for so long as he satisfactorily performed his duties for which he was hired, the employer may not discharge the employee without showing honest dissatisfaction with the employee's work. *Id.* at 168; *Accord, Porter v. United Motels, Inc.*, 315 S.W.2d 340 (Tex.Civ.App. —Waco 1958, no writ).

Ashley's employment with appellant resulted from his successful completion of a one-year management trainee course. In 1951, appellant decided that for the first

time it would go directly to colleges to recruit management trainees. Ashley was interviewed by appellant and on May 1, 1951, was sent the following letter:

Dear Jim:

This will confirm the offer I made you on April 30 of employment with our Company starting in June. The starting salary will be $270 per month. If your progress is satisfactory and you wish to remain with our Company, you will receive a $20 increase at the end of the first six months and another at the end of the first twelve months. You will be on a supervisory basis from the start and will receive approximately one year's training. Your progress after that time will depend upon your performance. The passing of a physical examination is one of the requirements of employment.

Attached is a form for the report of your physical examination. Will you please have the examination made by either Dr. W. Gordon Maddox or Dr. W. S. Miller, Jr., at Denton. He should send the report to me and we will pay the bill. When his report is received showing your physical condition satisfactory, I will inform you whether the starting date will be June 4 or June 11.

I appreciated the opportunity of talking to you and showing you a little of the Commercial work in Dallas. I'm sorry not to have been able to spend more time with you.

Sincerely yours,
(C. W. Clark)
Commercial Personnel Supervisor

Of approximately 30 people in this class of management trainees, Ashley and about thirteen others successfully completed the course. It is this letter that Ashley contends amounted to his satisfactory performance contract. We disagree.

The employment contracts involved in both the *Porter* and *Hardison* cases contain specific agreements to the effect that the employee would be employed for so long as he satisfactorily performed his duties. In the instant case, we find no contractual limitation or qualification which would limit

appellant's right to discharge Ashley with or without cause. The letter in question pertains only to the one-year training program and does not promise future employment.

We hold that there was no evidence to require the submission of the requested issue and the trial court was correct in refusing same. The judgment of the trial court is reversed and judgment is here rendered that plaintiffs take nothing.

KLINGEMAN, J., did not participate in the disposition of this appeal.