ACCEPTED
01-15-00320-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 4:20:20 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00320-CV

**IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT
HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
6/12/2015 4:20:20 PM
CHRISTOPHER A. PRINE
Clerk

REVENEW INTERNATIONAL, LLC, Appellant,

vs.

PSC INDUSTRIAL OUTSOURCING, LP, Appellee.

On Appeal from the 281st Judicial District Court
Harris County, Texas
Trial Court Case No. 2013-59946

**APPELLEE'S BRIEF**

**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING P.C.**
Todd W. Mensing
Adam Milasincic
Edward Goolsby
1221 McKinney, Suite 3460
Houston, Texas 77010
Phone: (713) 655-1101
Fax: (713) 655-0062
*tmensing@azalaw.com*
*amilasincic@azalaw.com*
*egoolsby@azalaw.com*

**COUNSEL FOR APPELLEE**

**ORAL ARGUMENT CONDITIONALLY REQUESTED**

TABLE OF CONTENTS

I.      Statement of the Case ..................................................................................1

II.     Issues Presented .........................................................................................1

III.    Statement Regarding Oral Argument ..........................................................2

IV.     Statement of Facts.......................................................................................2

        A.      Revenew accuses PSC of overcharging Exelon by nearly $2 million, forcing PSC to either pay Exelon or lose the client. ...........................2

        B.      Revenew designs an audit process that is tainted with conflicts of interest. ....................................................................................................4

        C.      Revenew removes low-dollar invoices from consideration, deletes samples that do not meet Revenew's secretive criteria, and creates new samples until Revenew's executives find one they like. ...............5

                1.      Revenew intentionally "cleans up" the data by deleting small-dollar invoices and considering only PSC's higher-dollar invoices. ...................................................................................7

                2.      Revenew further inflates the appearance of overbilling by handpicking a sample with even more expensive invoices. .......8

                3.      Revenew discards its original samples—and its own rules—to choose smaller samples with still-higher dollar values. .............9

        D.      Revenew convinces Exelon to repudiate its prior billing agreements with PSC and multiplies PSC's resulting "errors" by almost one-hundred fold. ..........................................................................................12

        E.      After PSC is forced to pay Exelon, Revenew collects its "big fat check." ......................................................................................................14

        F.      Judge Matthews twice denies summary judgment, and Revenew then brings this interlocutory appeal, claiming that its emails to Exelon were somehow "published by the electronic or print media." ............15

V.      Summary of Argument .........................................................................16

VI.    Arguments and Authorities............................................................18

    A.    This Court lacks jurisdiction: The trial court's order denying
        Revenew's motion for summary judgment is interlocutory and non-
        appealable. ................................................................................18

    B.    Even if the Court were to address Revenew's merits arguments, the
        order denying summary judgment should be upheld. .........................19

        1.    Revenew's statements were false. ...........................................19

            a.    PSC easily withstands Revenew's no-evidence challenge.
                ..................................................................................19

            b.    Accusations of overbilling can be wrong; no rule of law
                (or logic) supports Revenew's argument that, if a
                statement is paired with numbers, that statement can
                never be proven false. ......................................................23

        2.    Revenew exhibited all four variants of malice toward PSC......25

            a.    Revenew knew its accusations were false or was at least
                reckless about the truth. ...................................................25

            b.    Revenew acted with ill will toward PSC and intended to
                 interfere with PSC's economic interests..........................28

        3.    Revenew fails to prove its affirmative defense of justification.
            ..........................................................................................30

            a.    No justification defense is available because Revenew's
                interference was accomplished by means of independent
                torts. ................................................................................31

            b.    There is, at minimum, a conflict in evidence about
                whether Revenew was acting pursuant to its contract with
                Exelon. ............................................................................31

            c.    Revenew did not exercise its rights in good faith. .........33

        4.    Revenew failed to conclusively prove its privilege defense.....35

Conclusion .............................................................................................37

Certificate of Compliance ....................................................................39

Certificate of Service .........................................................................39

iii

**Cases**

*Am. Nat'l Petro. Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274 (Tex. 1990) .........................................................................................................................33

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) ........................................... 20, 24, 28

*Calhoun v. Chase Manhattan Bank (U.S.A.), N.A.*, 911 S.W.2d 403 (Tex. App.—Houston [1st Dist.] 1995, no pet.)...............................................................36

*Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) ...............................................................................35

*Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422 (Tex. App.—Waco 1997, no pet.) 25

*Ernst & Young, LLP v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573 (Tex. 2001) .......33

*Ervin v. Mann Frankfort Stein & Lipp CPAs, L.L.P.*, 234 S.W.3d 172 (Tex. App.—San Antonio 2007, no pet.) ................................................................................33

*Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426 (Tex. App.—Beaumont 2008, pet. denied) .........................................................................................26

*Gaylord Broad. Co., L.P. v. Francis*, 7 S.W.3d 279 (Tex. App.—Dallas 1999, no pet.)............................................................................... 20, 23, 25, 27, 28

*Gonzalez v. Hearst Corp.*, 930 S.W.2d 275 (Tex. App.—Houston [14th Dist.] 1996, no writ) ........................................................................................................26

*Hansen v. Jackson*, No. 13-14-00039-CV, 2014 WL 5794872 (Tex. App.—Corpus Christi Nov. 6, 2014, pet. filed) ..........................................................................27

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989)......................28

*Hearst Corp. v. Skeen*, 159 S.W.3d 633 (Tex. 2005)...............................................28

*Hipsaver, Inc. v. Kiel*, 984 N.E.2d 755 (Mass. 2013)..............................................30

*Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762 (Tex. 1987) ................ 19, 25, 30

*Jefferson v. Hackney*, 406 U.S. 535 (1972) (Douglas, J., dissenting) .....................23

*Kipp v. LYV Aerospace & Defense*, 838 F. Supp. 289 (N.D. Tex. 1993)...................37

*Main v. Royall*, 348 S.W.3d 381 (Tex. App.—Dallas 2011, no pet.) ........................18

*Mensa-Wilmot v. Smith Int'l, Inc.*, 312 S.W.3d 771 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ...........................................................................................28

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)..............................................24

*Moore & Assoc. v. Metro. Life Ins. Co.*, 604 S.W.2d 487 (Tex. Civ. App.—Dallas 1980, no writ)........................................................................................................23

*Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ...............................................22

*Phillips v. State*, 77 S.W.3d 465 (Tex. App.—Houston [1st Dist.] 2002, no pet.)....18

*Procter & Gamble Mfg. Co. v. Fisher*, 449 U.S. 1115 (1981) (Rehnquist, J., dissenting) .........................................................................................................23

*Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74 (Tex. 2000)..31, 34, 35

*Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640 (Tex. 1995) ..............36

*Scripps Texas Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829 (Tex. App.—Corpus Christi 2003, pet. denied).......................................................................................23

*Serv. Emps. Int'l Union Local 5 v. Prof'l Janitorial Serv. of Houston*, 415 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ................................. 1, 2, 18

*Stearns v. McManis*, 543 S.W.2d 659 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ dism'd)........................................................................................................29

*Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989).....................................30

*Sw. Bell Tel. Co. v. Dixon*, 575 S.W.2d 596 (Tex. Civ. App.—San Antonio 1978), *writ dism'd w.o.j.*, 607 S.W.2d 240 (Tex. 1980) ..................................................36

*Turner v. KTRK Television, Inc.*, 38 S.W.3d 103 (Tex. 2000)................................19

*Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931 (Tex. 1991) ................. 34, 36

**Statutes**

22 TEX. ADMIN. CODE § 501.62 ...............................................................................4

RESTATEMENT (SECOND) OF TORTS § 651(2) (1977) ...................................................35

TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6)........................................ 1, 15, 16, 18

**Other Authorities**

DARRELL HUFF, HOW TO LIE WITH STATISTICS 11 (1954) .......................................24

# I. STATEMENT OF THE CASE

PSC Industrial Outsourcing, L.P. cleans power plants for Exelon Corporation. Revenew International, LLC scrutinizes vendor invoices for Exelon to identify alleged overpayments in exchange for a cut of any proceeds recovered. Based on false data of its own creation, Revenew told Exelon that (1) PSC systematically violated its deal with Exelon and (2) overcharged Exelon by $1,899,213. Exelon believed Revenew and demanded payment, forcing PSC to either pay Exelon or lose the account. The problem? Revenew lied.

PSC sued Revenew for business disparagement and tortious interference. Judge Sylvia Matthews twice denied Revenew's motion for summary judgment on those claims, and Revenew brought this interlocutory appeal. The appeal can, and should, be resolved on purely jurisdictional grounds.

# II. ISSUES PRESENTED

1. Revenew's statements about PSC appeared only in private emails or conversations, never in the news media. Should the Court overrule its past decision in *Service Employees International Union Local 5 v. Professional Janitorial Services of Houston, Inc.*, 415 S.W.3d 387 (Tex. App.—Houston [1st Dist.] 2013, pet. denied), by holding that Revenew is nonetheless entitled to an interlocutory appeal under a statute available only to people whose words "appear[ ] in or [are] published by the electronic or print media?" TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6).

2. If the Court concludes that appellate jurisdiction exists over this order denying a motion for summary judgment:

    a. Is Revenew entitled to no-evidence summary judgment on the issue of whether its disparaging statements were false despite (1) PSC's analysis disproving the statements, (2) Revenew's admissions

that some of its statements were "pretty gray," and (3) expert testimony showing how Revenew's statements were false?

b. Has Revenew negated all material factual disputes about whether Revenew made its accusations knowing they were false, with reckless disregard for the truth, with ill will, and with the aim of harming PSC?

c. Regarding the tortious interference claim, has Revenew conclusively proven its affirmative defense of justification?

d. Regarding the business disparagement claim, has Revenew conclusively proven its affirmative defense of privilege?

## III. STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary because this Court's precedent plainly compels dismissal for lack of appellate jurisdiction. *SEIU Local 5*, 415 S.W.3d 387. The jurisdictional defect is dispositive and plain to see, meaning that any oral argument— let alone on the merits—would be inefficient at this premature stage. Nonetheless, Revenew seeks oral argument. If the Court grants Revenew's request, PSC seeks oral argument for the sole purpose of responding.

## IV. STATEMENT OF FACTS

### A. Revenew accuses PSC of overcharging Exelon by nearly $2 million, forcing PSC to either pay Exelon or lose the client.

PSC provides environmental, industrial, and consulting services. One of PSC's most important customers is Exelon Corporation, a large electric utility. (R. at 827.) Until March 2012, Exelon had no issues with PSC's billing practices and described its relationship with PSC as "very good." (R. 827, 830.) Then Revenew arrived.

2

Revenew performs audits despite having no certification from the American Institute of Certified Public Accountants. (R. at 846-47.)

After a so-called "audit" of PSC, Revenew told Exelon that PSC overcharged Exelon by $1,899,213 over a three-year period. (R. 869-70, 881.) Revenew also accused PSC of breaking specific promises to Exelon, claiming, for example, that PSC engaged in "excess billing" for certain laborers and double-billing for cancelled jobs. (R. at 865-70.) Contrary to Revenew's portrayal, the truth is that PSC *underbilled* Exelon by $221,426 during the three years covered by the audit. (R. 827-28, 907-09, Ex. G.)[1] Thanks to Revenew, however, Exelon accepted the false accusations of overbilling, forcing PSC to either lose Exelon's future business or to pay Exelon based on Revenew's accusations. (R. 917-18.)

After PSC had to pay Exelon, Revenew's founder and CEO, John Birks, gloated that "I love it when those tough ones settle and they got a [sic] to write that big fat check!" (R. at 924.) Revenew received $187,500 of the money PSC paid to Exelon. (R. at 976). What follows are the facts showing how Revenew fabricated the accusations of overbilling that led to Revenew's "big fat check."

---

[1]    Citations to sources other than the record are to the original summary judgment exhibit identifiers. The initial clerk's record did not include all exhibits to PSC's response to Revenew's Second Motion for Summary Judgment. PSC filed a request to supplement the appellate record on May 22, 2015. After this request has been processed, PSC will submit an amended version of this brief with citations to the supplemental appellate record.

3

**B.    Revenew designs an audit process that is tainted with conflicts of interest.**

Revenew's brand of audits should not be confused with the meticulous work product one expects from "Big Four" accounting firms. Although Revenew's CEO concedes that a legitimate audit firm must be neutral, Revenew's COO admits that Revenew is not neutral. *Compare* R. at 932 (auditors should be neutral and objective) *with* R. 950-52 (admitting that Revenew is not neutral). Instead, Revenew goads its clients into taking whatever position yields the most money for the client and, by extension, for Revenew. (R. 948-50.) Rather than searching for the objective amount of over- or underbilling, Revenew views audits as a forceful means to a lucrative end. For instance, Revenew's CEO encouraged Exelon to treat the PSC audit as "a steel hammer with a velvet glove." (R. at 964.)

At least 75 percent of Revenew's audits are performed on a contingent-fee basis, with Revenew earning nothing unless substantial billing "errors" are found. (R. 849, 852, 896.) As a result, workplace culture at Revenew is infused with a relentless focus on maximizing the appearance of supplier overbillings.[2] Managers circulate a daily "thermometer" to reflect auditors' progress in "finding" the preset overbillings

---

[2]    Although Revenew decries the possibility that its contingent-fee structure could incentivize employees to inflate audit findings, the American Institute of CPAs disagrees. Certified public accountants are ethically barred from performing contingent-fee audits. (R. at 969-70.) Even non-CPA consultants are bound to conduct audits with "integrity and objectivity." *See* 22 TEX. ADMIN. CODE § 501.62 (extending certain AICPA standards to consultants). Notably, a consultant's duty of objectivity "imposes the obligation to be impartial, intellectually honest, and free of conflicts of interest." (R. at 971.) Revenew's COO concedes that Revenew is not impartial. (R. 950-52.)

total that Revenew has identified as its target for the month. (R. at 852-53.) Revenew even developed a colorful term—"juice"—that it uses to describe Revenew's lucrative slice of the payments that audit targets are forced to make. (R. at 854-55.) When Revenew employees identify too few billing "errors," managers instruct them to "get it revved up tomorrow and crank up the thermometer." (Ex. TT.)

And employees have every incentive to comply. All Revenew workers who touch an audit from start to finish receive bonuses that turn on the size of the payment Revenew receives. (R. at 929-31.) For example, the Revenew employee responsible for auditing PSC, earns a base salary of $75,000, but he received a bonus of roughly $19,000—equal to 25 percent of his salary—based on the total overbillings he "found" in Revenew's audit of PSC. (*See* R. at 897-901.) That employee admits he would receive no commission for an audit that showed no overbillings. Not surprisingly, during his six-and-a-half-year tenure at Revenew, that employee has never conducted a single audit in which he concluded that the supplier billed too little or billed properly. (R. at 902-03.)

**C.      Revenew removes low-dollar invoices from consideration, deletes samples that do not meet Revenew's secretive criteria, and creates new samples until Revenew's executives find one they like.**

Revenew had its eyes on a large payment from PSC before starting the audit. Throughout the process, Revenew was counting down to its "good pay day" from PSC. (R. at 981.) In fact, Exelon's "good spend" on PSC was one of the reasons that

Revenew agreed to perform the audit at all. (R. at 988-92.) Because Revenew had audited PSC twice before, Revenew knew that PSC's contracts involved large-dollar projects and complex terms that Revenew could twist into "error" findings. (R. at 988-92, 1006.)

The typical Revenew audit results in error findings of $100,000 to $200,000—and thus contingency fees of just $30,000 to $60,000. (*See* R. at 953-55.) In this case, however, Revenew accused PSC of nearly $2 million in overbillings and reaped $187,500 in fees—more than five times Revenew's typical cut. (R. at 861-69, 976.) When the size of Revenew's fee became clear, Revenew's CEO, Birks, celebrated his good fortune in receiving "that big fat check!" (R. at 924.)

To create some semblance of credibility for its accusation that PSC overbilled Exelon by $1,899,213, Revenew crafted an elaborate matrix based on sampling techniques made up by Revenew. (*See* R. at 1021.) Revenew singled out PSC as the target of these sampling methods despite knowing that Exelon expected Revenew to "quanti[f]y [alleged overbillings] dollar for dollar" and despite having performed dollar-for-dollar audits of every Exelon vendor except PSC. (Ex. S.) Before starting the audit, Revenew even assured PSC that "extrapolation will not be a major piece, we want to quantify dollar for dollar." (Ex. T.) When enticed by Exelon's attractive "spend" on PSC, however, Revenew resorted to "sampling" instead of reviewing all invoices. (Ex. Q.) Revenew selected just 90 of PSC's 8,044 bills, found only $31,090

in purported errors, but then told Exelon that PSC had overcharged by $1,899,213. (*See* R. at 861-70; Ex. U.)

### 1. Revenew intentionally "cleans up" the data by deleting small-dollar invoices and considering only PSC's higher-dollar invoices.

Revenew's incentive to falsify results was on display from the outset of the PSC audit. Before the audit began, PSC supplied Revenew with a list of all invoices for February 2009 to January 2012, ranging in price from $1.19 to $180,731.37. (R. at 827; Ex. U.) Revenew's first step was to delete from that list all 1,372 invoices that were worth less than $100. (*See* R. at 997-1000.) In other words, nearly one out of five PSC invoices had no chance of being included in Revenew's purportedly "random" sample. (R. at 997-1000.)

Not coincidentally, most of the 1,372 invoices that Revenew purposely ignored were worth about $65. (Ex. U.) In contrast, the invoices that Revenew did consider had a mean value exceeding $2,900. (Ex. U.) By manipulating the sample to include only top-dollar invoices, Revenew enabled itself to "find" more expensive "errors."

Revenew calls this practice of deleting low-dollar invoices its "clean up" process. (Ex. W.) In other words, Revenew requires employees to consider the value of each invoice in "cleaning up" data to exclude small-dollar invoices from the purportedly random sample. (R. at 999.) Recognizing the implications of this evidence, Revenew witnesses offered wildly different explanations about the "clean up" process or denied even knowing the term.

7

For instance, Mike Nayebpour, who helped Revenew design its sampling methods, candidly wrote that Revenew's "clean up procedures are intended to remove . . . items with small dollar amounts at or near zero." (Ex. W.) But Aileen Jamir, the Revenew employee responsible for performing the "clean up" process, says that Nayebpour's description is wrong and that she never discards low-dollar invoices. (Ex. X, Jamir 54:25-56:22.) Revenew's information technology director admits that any discrepancies between Nayebpour's descriptions and Revenew's actual practices could suggest suspicious or improper behavior. (Ex. V, Moore 166:5-166:13.) Meanwhile, Jamir's own supervisor says that Jamir *did* omit low-dollar invoices from this very audit. (R. at 997-1000.) In sum, Revenew's "clean up" process creates the false appearance of overbilling by singling out only the largest invoices for scrutiny and then passing off high-dollar "errors" on those bills as representative of all PSC invoices. (R. at 1018-21.)

2. **Revenew further inflates the appearance of overbilling by handpicking a sample with even more expensive invoices.**

Once it discarded all low-value invoices, Revenew was not done manipulating the sample of PSC's invoices. First, Revenew sliced the remaining invoices into three categories, one for each line of business that PSC does with Exelon. (R. at 1008.) From each of those categories, Revenew chose samples. In describing the samples, Revenew represents that the "undisputed evidence in this case is that the invoices were chosen randomly." (R. at 499.) In truth, Revenew's IT director and corporate

8

representative admits that "[t]he final product sample that is produced for auditing is not a completely random sample." (Ex. V, Moore 39:22-41:13) That is because Revenew has programmed its software to delete any samples that do not satisfy the selection criteria that Revenew baked into the software. (Ex. V, Moore 39:22-41:13.)

Revenew cloaks its deletion criteria in jargon, claiming that the software merely discards samples that do not meet the "z-test" and "chi-squared test" (as opposed to choosing samples likelier to yield bigger "errors"). (Ex. V, Moore at 118:17-119:1.) Yet Revenew's IT director, who picked the samples in this case, cannot explain how either of the supposed selection criteria work. (Ex. V, Moore 48:19-49:13; 59:8-60:10.) And Revenew's president, Kris Westbrook concedes that, whatever these "tests" do, they do not ensure the sample is representative of billing errors, which is what Revenew claims to be looking for. (R. at 841-42.)

### 3. Revenew discards its original samples—and its own rules—to choose smaller samples with still-higher dollar values.

Even after selecting non-random invoice samples using Revenew's custom criteria, Revenew's executives then threw back the samples they did not like. (R. at 993-94; Ex. Y.) Revenew first drew 50-invoice samples for the two larger categories of PSC business. (R. at 993-94; Ex. Y.) But after seeing the total dollar value of those samples, Revenew's executives threw out those samples and—contrary to Revenew's internal rules—created new samples of just 30 invoices apiece. (R. at 993-94, 1001-02; Ex. Z.)

9

What did Revenew's executives see in the original samples that caused them to be thrown away in favor of smaller ones? Consider the discarded versus ultimately-used samples for PSC's "Peco" business segment:

|  | **Original 50-invoice sample that Revenew threw away** | **Smaller 30-invoice sample Revenew chose to use** |
|---|---|---|
| *Invoices reviewed* | 50 out of 3,262 | 30 out of 3,262 |
| *Average value of invoice within sample* | $6,703 | $7,814 |
| *Population sum of all invoices within sample* | $335,175 | $234,424 |

By throwing away the larger sample, Revenew achieved two sleights of hand. First, the invoices in the new, smaller sample have a higher average value. (Ex. Z; Ex. AA.). Because the average invoice value jumped by more than $1,000 in the new sample, Revenew set itself up to find more expensive "errors" on each bill reviewed. (Ex. AA, REV001571.) More expensive bills offer more chances to claim more expensive errors.

Second, Revenew threw away the sample with the larger population sum. That sum is all-important because it is the denominator in Revenew's extrapolation equation. (Ex. Z.); (*see also* R. at 500.) ("The formula for the extrapolation factor is a simple one: Population Sum ÷ Sample Sum."). By taking the total value of all Peco

invoices ($21,148,657) and dividing it by the sum of the original 50-invoice sample ($335,175), Revenew arrived at an extrapolation factor of 63.10. (Ex. Z.) In other words, if Revenew found a single $1,000 error, it would multiply that error by 63.10 to accuse PSC of overbilling by $63,310.

But Revenew was not happy with a multiplier of just 63. It wanted a larger multiplier, so Revenew's executives went back to the well for a new sample. (R. at 993-94, 1001-02; Ex. Y.) In the new sample, the population sum naturally dropped to $234,424 because only 30 invoices were reviewed. (R. at 993-94, 1001-02; Ex. Y.) The result is a smaller denominator. Dividing the value of all Peco invoices ($21,148,657) by the sum of the 30-invoice sample ($234,424) yields an extrapolation factor of 90.22, rather than the original 63.10. (R. at 993-94, 1001-02; Ex. Y.) Consequently, Revenew would take the same $1,000 error, for example, and use it as the pretense for accusing PSC of $93,220 in overbillings instead of the $63,310 that would have resulted from using the original 50-invoice sample. This one trick of cutting samples to 30 invoices instead of 50 assured a larger extrapolation factor, allowing Revenew to convey the false impression of even more overbilling. (R. 1019-20.)

Revenew's selective fishing for larger multipliers was contrary to Revenew's own rules. Because more than 500 invoices were at issue in two of PSC's business segments, Revenew's "best practice" was to use a 50-invoice sample for each

11

segment. (R. at 1001-02; Ex. BB; Ex. CC.) But after seeing the average and population values of the 50-invoice samples, Revenew's Juliana Routzong and Dave George twice ordered the creation of *smaller* samples containing just 30 invoices. (Ex. EE.) Routzong did so despite admitting that she believed 50 was the correct sample size for at least one of the categories. (R. at 995.) Moreover, Revenew's COO, who oversees the audit process, admits that it was contrary to his expectations for Revenew to discard its own best-practice sample sizes. (R. at 956-58.)

**D.      Revenew convinces Exelon to repudiate its prior billing agreements with PSC and multiplies PSC's resulting "errors" by almost one-hundred fold.**

Creating a larger multiplier or "extrapolation factor" is only the first step in a Revenew audit. After deciding to multiply each error by 90.22, Revenew had to set out in search of errors to multiply. This job belonged to Bill Shoemaker, who was tasked with identifying as many "errors" as possible in each sample invoice. (*See* R. at 879, 894-95.)

In PSC's ComEd business segment, for example, Shoemaker found three instances—out of 8,044 invoices—where he claimed that PSC overbilled for laborers. (R. at 865, 869.) This "error" finding is emblematic of Shoemaker's work. Three times, PSC dispatched a three-man work crew in one truck. (R. at 865, 869.) According to Shoemaker, the cost of the truck was reflected in the first two workers' hourly rate, meaning that PSC "overbill[ed]" by not awarding a discount for the third laborer's time. (R. at 865, 869.) These three purported "errors" amounted to just

12

$2,290, but Shoemaker multiplied them by 70.22 (Revenew's extrapolation factor for the ComEd segment) to accuse PSC of $178,625 in overbillings. (R. at 865, 869-70.) Similar examples abound (R. at 861-70), but one proves the point.

Revenew's COO admits that some of Revenew's "error" findings in this audit were "pretty gray" and were worth as little as 25 percent of what Revenew told Exelon. (Ex. GG, REV000496.) On one purported "overbilling" of $233,000, for example, Revenew privately conceded that the Exelon-PSC "contract language supports" PSC's position. (Ex. HH, REV000013.) Yet Revenew still used that purported overbilling as "leverage" for a higher payment from PSC. (Ex. HH, REV000013.)

Importantly, Revenew did not identify *pending* invoices and convince Exelon not to pay them. Instead, Revenew scoured long-ago-paid invoices years after the fact to find line items that—with no reference to context or historical practice—it could label as "errors." Before Revenew's involvement, Exelon had already chosen to pay these invoices after passing them through several levels of internal approval. (Ex. II, McDonald 40:16-40:24, 43:25-44:22, 49:16-49:23.)

Then Revenew convinced Exelon to repudiate its billing agreements with PSC by supplying ammunition that Revenew knew was bogus: alleged contract "violations" culled from non-representative samples, which Revenew then inflated by nearly one-hundred-fold using extrapolation. (*Supra* § IV.C.3.) Revenew not only

13

"discovered" the errors, it sat in the driver's seat for the rest of the audit—providing behind-the-scenes coaching on how best to "soften up" PSC into paying, ghost-writing Exelon's demands to PSC, and even sending a Revenew employee to hide in a nearby room while Exelon demanded money from PSC. (R. at 884-93.)

**E.      After PSC is forced to pay Exelon, Revenew collects its "big fat check."**

As the audit progressed, Revenew falsely told Exelon that PSC had overbilled Exelon by exactly $1,899,213. Exelon accepted Revenew's representations without question, adopting verbatim Revenew's accusations of overbilling and then sending those accusations to PSC along with a demand for payment. *Compare* R. at 861-70 (Revenew draft) *with* Ex. JJ (Exelon copy); *see also* R. at 881-83 (confirming that Exelon simply relays Shoemaker's drafts to PSC).

The massive commercial pressure on PSC was well known to Revenew's CEO. Birks used that pressure to "soften" PSC executive Liz Crow in a telephone call, telling Crow that PSC "need[s] to move the needle much further north" and that "Exelon is not going to back off." (R. at 964.) Birks then used confidential information from Revenew's past audits of PSC to assure Exelon that PSC would pay a higher number to preserve the client relationship. (R. at 964) Birks further encouraged Exelon to use a "steel hammer with a velvet glove" by emphasizing the future business that PSC stood to do with Exelon. (R. at 964.)

14

Faced with the clear threat of losing Exelon's business, PSC had no choice but to defuse Revenew's accusations by paying Exelon $620,000 and declining to collect more than $220,000 that Exelon owed for past services. (R. at 709-11, 828.) In turning over this money to Exelon, PSC specified that it was making a "customer satisfaction payment"—the necessary cost to "continue the amicable relationship that the parties enjoy" in the aftermath of the "irreconcilable issues" spawned by Revenew's audit. (R. at 709-10.) In return for forcing this payment, Revenew received $187,500 of the money that PSC paid to Exelon. (R. at 976.)

**F.    Judge Matthews twice denies summary judgment, and Revenew then brings this interlocutory appeal, claiming that its emails to Exelon were somehow "published by the electronic or print media."**

PSC sued Revenew for business disparagement, tortious interference, and unjust enrichment. Judge Sylvia Matthews of the 281st Judicial District Court denied Revenew's first motion for summary judgment in May 2014. Revenew did not appeal. Revenew moved again for summary judgment in November 2014. On March 18, 2015, Judge Matthews denied summary judgment as to PSC's business disparagement and tortious interference claims.

On April 7, Revenew appealed, citing section 51.014(a)(6) of the Texas Civil Practice and Remedies Code as its only basis for appellate jurisdiction over an interlocutory order. According to Revenew, its statements in the audit were "published by the print or electronic media" because the "allegedly libelous statement appeared

15

in electronic or print form," i.e., in a "medium." (Resp. to Mtn. to Dismiss at 10, 19.) On April 15, PSC moved to dismiss this appeal for lack of jurisdiction and to recover attorneys' fees from Revenew for its frivolous invocation of section 51.014(a)(6). That motion is pending.

## V. SUMMARY OF ARGUMENT

First and foremost, this Court lacks jurisdiction to hear this appeal because Revenew does not satisfy the requirements of section 51.014(a)(6). Specifically, Revenew's disparaging comments never appeared in nor were published by "the electronic or print media." These comments only appeared in private letters, conversations, or emails.

If the Court does decide to rule on the merits of this appeal, Judge Matthews was correct in twice denying Revenew's motion for summary judgment.

First, PSC provided ample evidence that Revenew's allegations of PSC overbilling Exelon were false. Revenew invented the "errors" by manipulating invoice samples, violating its own "best practices," and taking numerous other steps to inflate the appearance of overbilling.

Second, PSC proved all four types of malice, and proof of even one type defeats summary judgment. PSC showed, through a series of admissions from Revenew's own employees, that Revenew knew its statements were false or recklessly disregarded their truth. Revenew also harbored ill will towards PSC and sought to

16

interfere with PSC's economic interests because Revenew went out of its way to target only PSC (as opposed to Exelon's other vendors) and maximize the "errors" found to capitalize on its contingency-fee fueled audit.

Third, Revenew failed to conclusively prove its affirmative defense of justification. That defense is not available at all because Revenew interfered with the PSC-Exelon relationship through independently tortious means: business disparagement of PSC and fraudulent or negligent misstatements to Exelon. Moreover, Revenew did not comply with the terms of its contract with Exelon, further making this defense inapplicable. Furthermore, in light of its defective and tortious audit, as discussed above, Revenew failed to act in good faith.

Fourth, Revenew failed to conclusively prove its affirmative defense of privilege for the same reasons it failed to prove justification. Specifically, privilege requires Revenew to adhere to the contract with Exelon in order to protect itself from liability in a business disparagement case.

In light of these arguments, the Court should dismiss Revenew's appeal, or, in the alternative, affirm Judge Matthew's denial of Revenew's Second Motion for Summary Judgment.

## VI. ARGUMENTS AND AUTHORITIES

**A.** **This Court lacks jurisdiction: The trial court's order denying Revenew's motion for summary judgment is interlocutory and non-appealable.**

PSC will not reargue its entire motion to dismiss in this space. But the jurisdictional problem bears repeating. Before addressing the merits, this Court must determine its appellate jurisdiction. *Phillips v. State*, 77 S.W.3d 465, 466 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Revenew cannot bring this interlocutory appeal without showing that it published its disparaging comments in "the electronic or print media." TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6).

There is no evidence that Revenew said anything about PSC except in private letters, emails, and conversations. *See* PSC's Reply in Support of Motion to Dismiss at 5-7. This Court and others have already rejected Revenew's fanciful view that, merely by putting pen to paper or keystroke to keypad, Revenew published statements "in . . . the media." *SEIU Local 5*, 415 S.W.3d at 395 (holding that "self-published statements in letters to third parties, flyers, handbills, newsletters, website postings, press releases, reports, and oral testimony" cannot create jurisdiction under section 51.014(a)(6)); *Main v. Royall*, 348 S.W.3d 381, 386-87 (Tex. App.—Dallas 2011, no pet.) (declining to hold that "anyone with a computer, typewriter or printer will . . . have the right to file an interlocutory appeal").

Based on the Court's controlling opinion in *SEIU Local 5*, the Court can—and should—stop reading here. Without jurisdiction, the merits are moot.

18

**B. Even if the Court were to address Revenew's merits arguments, the order denying summary judgment should be upheld.**

**1. Revenew's statements were false.**

Judge Matthews was correct in denying Revenew's motion as to PSC's business disparagement and tortious interference claims, as PSC introduced sufficient evidence of falsity and malice. PSC demonstrated Revenew's statements were false and malicious. Moreover, Revenew failed to conclusively prove its affirmative defenses of justification or privilege.

**a. PSC easily withstands Revenew's no-evidence challenge.**

A statement must be false to be disparaging. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex. 1987). Revenew's statements about PSC were false. To defeat Revenew's no-evidence motion on this issue, PSC's burden is not a steep one. PSC need only provide more than a scintilla of evidence that Revenew's statements were misleading enough to cast suspicion on PSC. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117-18 (Tex. 2000). Among other ways, PSC can prove falsity by showing that Revenew omitted material facts or misleadingly juxtaposed others, leaving Exelon with a "substantially false impression." *Id*.

Even ignoring PSC's low burden, voluminous evidence shows that Revenew's statements were false. Revenew accused PSC of overbilling Exelon by $1,899,213 and of violating its contract with Exelon in numerous ways. (R. at 850, 862-864, 869-70.) But PSC's own analysis reflects that, in the aggregate, PSC actually *underbilled*

19

Exelon by at least $221,426 during the years covered by the audit. (R. at 827-28, 907-08; Ex. G.) That evidence alone requires denial of summary judgment. *See Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002) ("If the evidence is disputed, falsity must be determined by the finder of fact.").

Revenew's admissions further prove falsity. Revenew's employee privately identified the "fair" picture of PSC's overbillings as $535,000, not the $1.9 million that Revenew presented to Exelon. (Ex. NN, REV000009.) Revenew's employees also concede that some of Revenew's accusations about PSC were "pretty gray" and that Revenew's "extrapolated total" for one purported overbilling could have been higher than the real total. (Ex. GG; Ex. OO, REV001256.)[3]

Revenew's president admits that Revenew's conclusions are only as true as the invoice samples that it draws. (R. at 839-40.) As detailed above, Revenew purposefully skewed those samples, both in content and size, to falsely accuse PSC of

---

[3]    Revenew is correct that one conceivable way to disprove Revenew's accusations would be for PSC to self-audit all 8,044 invoices. But Revenew takes that position to an illogical extreme, stating that such a burdensome exercise is the *only* way for PSC to prove the falsity of Revenew's statements. (App. Br. at 20.) Of course, Revenew cites no authority for its proclamation that "[t]o prove *actual* falsity . . . PSC would have to compare the extrapolated amount with the actual amount obtained from a review of each invoice." (*Id.*) No such authority exists. To the contrary, Texas courts have ruled that it is unnecessary to review each and every data point to determine whether a statement is false or substantially true. *See Gaylord Broad. Co., L.P. v. Francis*, 7 S.W.3d 279, 282, 285-86 (Tex. App.—Dallas 1999, no pet.) (holding that "evidence exists from which a jury could find that *some* of the statements made were false" instead of requiring plaintiff to re-examine all 9,000 entry and exit records upon which defendants' false statements were based (emphasis added)). The mere fact that PSC could prove falsity with one form of evidence does not preclude PSC from proving falsity with different evidence—such as Revenew's own admissions. Revenew's position that a self-audit would be the "best" way to prove falsity is nothing more than a jury argument.

20

rampant overbilling. (*Supra* § IV.C.) First, Revenew set aside the 1,372 lowest-dollar invoices, disregarding nearly 20 percent of PSC's invoices and thus creating a substantially false impression. (*Supra* § IV.C.1.) Next, Revenew jettisoned its own "best practices" to delete purportedly random invoice samples that offered fewer opportunities for Revenew to "find" high-dollar errors. (*Supra* § IV.C.3.) That one ruse enabled Revenew to multiple $1 "errors" by 90.22, grossly inflating the appearance of overbilling. (R. at 993-94, 1001-02, 1019-20; Ex. Y.) It is difficult to imagine a scenario better fitting the phrase "garbage in, garbage out."

Additionally, expert testimony confirms that Revenew reported false results. (R. at 1009.) Dr. Charles Cowan was a director of PricewaterhouseCoopers, served as chief statistician for three federal agencies, designed surveys for the U.S. Census Bureau, and taught statistics courses at three universities. (R. at 1022-23.) By applying this expertise and reviewing Revenew's work, Dr. Cowan concluded that Revenew's accusation of $1,899,213 in overbillings was incorrect. (R. at 1009.)

First, Revenew's manipulated invoice samples were far too small to yield any true determination of errors. (R. at 1012-13.) If Revenew had actually applied the methods that it purported to, it would have needed to review 5,037 invoices, not 90. (R. at 1013-14.) Moreover, all of the samples that Revenew used were "upwards biased," meaning they had a higher dollar value relative to the total invoice population. (R. at 1019.) If Revenew were really using random samples—instead of falsely

21

inflating the appearance of overbilling—there is only a 1.47 percent chance that it would have drawn three out of three samples with above-average dollar values. (R. at 1020.) Finally, Revenew "found" just one invoice out of the 90 sampled that reflected an undercharge by PSC. (R. at 1021.) In other words, 98.9 percent of the "errors" Revenew found were in one direction—the direction that favored Revenew's bottom line. (R. at 1021.)

Revenew suggests that, if any overbilling existed, then Revenew's accusation of multi-million-dollar overbilling was no more harmful than an accurate report would have been. (App. Br. at 21.) But when the truth is that few or no billing errors occurred,[4] painting a picture of systematic errors approaching $2 million is a far cry from telling the "substantial truth." *Cf. Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 84–85 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (where water leaks occurred, describing result as "cascade" of water was no more damaging than less vivid description would have been). Revenew's own COO confirms that an accusation of overbilling can hurt a company's reputation. (R. at 959.)

Taken together, PSC's contrary analysis, Revenew's admissions, Revenew's rigged audit process, and Dr. Cowan's expert testimony amount to well more than a scintilla of evidence that Revenew's accusations were false. *See*, *e.g.*, *Scripps Texas*

---

[4] In reality, PSC underbilled Exelon by $221,426. (*See* R. at 827-28.)

*Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 836 (Tex. App.—Corpus Christi 2003, pet. denied) (finding sufficient evidence of falsity where newspaper accurately reported that doctor left sponge in patient's stomach but failed to mention that patient dismissed resulting lawsuit); *Gaylord*, 7 S.W.3d at 286 (recognizing fact question on falsity of reporter's statement that judge left work early 67 percent of the time because judge supplied "evidence that indicates his work habits are considerably better").

      **b.**     **Accusations of overbilling can be wrong; no rule of law (or logic) supports Revenew's argument that, if a statement is paired with numbers, that statement can never be proven false.**

Citing nothing, Revenew argues that a report of billing errors "cannot, as a matter of law, be a statement of *fact* that can be 'true' or 'false.'" App. Br. at 19. Revenew is wrong. *See*, *e.g.*, *Moore & Assoc. v. Metro. Life Ins. Co.*, 604 S.W.2d 487, 489 (Tex. Civ. App.—Dallas 1980, no writ) (finding material fact dispute over defamation claim arising from insurer's statement that doctor's "charges were excessive"). It is no secret that extrapolation and related statistical functions can be—and often are—twisted to support false conclusions. *See generally Procter & Gamble Mfg. Co. v. Fisher*, 449 U.S. 1115, 1118 (1981) (Rehnquist, J., dissenting) ("Disraeli's familiar statement that 'there are three kinds of lies: lies, damned lies and statistics,' rings true in this case."); *Jefferson v. Hackney*, 406 U.S. 535, 552 (1972) (Douglas, J., dissenting) (observing that state rerouted money to favored recipients "by manipulating a mathematical formula"); DARRELL HUFF, HOW TO LIE

23

WITH STATISTICS 11 (1954) ("This book is a sort of primer in ways to use statistics to deceive. . . . The crooks already know these tricks; honest men must learn them in self-defense.").

Beyond asserting that extrapolation is sacrosanct, Revenew claims to have expressed only "opinions" about overbilling. App. Br. at 19. Yet Revenew nowhere acknowledges the Texas Supreme Court's test for distinguishing between facts and opinions. To qualify as protected "opinion," a statement cannot imply facts that are objectively verifiable. *Bentley*, 94 S.W.3d at 580; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990) (courts recognize no "wholesale . . . exemption for anything which might be labeled 'opinion'" because, if "a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth").

In *Bentley*, for instance, a talk show host accused a judge of corruption. *Bentley*, 94 S.W.3d. at 566-67. In deciding that the host's statements were not mere "opinion," the court considered the full context: in making the statement, the host (1) "cited specific cases and occurrences," (2) "pointed to court records and public documents"; and (3) "made lengthy investigations and interviewed court employees and others." *Id.* at 583. Like the defendant in *Bentley*, Revenew did not simply claim that "in our opinion, PSC billed too much." Revenew instead pointed to a specific 90 invoices (30 for each of PSC's audited business segments), 682 line items, and detailed

24

spreadsheets to assert PSC had overbilled Exelon by the precise amount of $1,899,213. (R. at 869-70.) As a result, Revenew's accusations of specific overbillings were too laced with purported "facts" to qualify as mere opinions. *See*, *e.g.*, *Gaylord*, 7 S.W.3d at 286 (holding that the following statement was not an opinion because it implies assertions of fact: "Records suggest Francis leaves the courthouse early 67% of the time and works only a half day 50% of the time.").[5]

## 2. Revenew exhibited all four variants of malice toward PSC.

In business-disparagement cases, malice exists if the defendant knew its statement was false, displayed "reckless disregard" for the truth, acted with "ill will," or "intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Hurlbut*, 749 S.W.2d at 766. Any one of these forms of malice is enough to warrant trial, and PSC has sufficient evidence to establish all four varieties.

### a. Revenew knew its accusations were false or was at least reckless about the truth.

Revenew told Exelon that PSC overbilled by $1,899,213. (R. at 869-70.) Privately, however, Revenew identified the "fair" value of PSC's alleged overbillings as just $535,000. (Ex. NN.) Revenew's COO admits that Revenew made "pretty gray"

---

[5]     *Delta Air Lines, Inc. v. Norris*, the only case identified by Revenew (App. Br. at 17-19), does not hold otherwise. 949 S.W.2d 422, 427 (Tex. App.—Waco 1997, no pet.). In *Delta Air Lines*, an employer said that former employees had "failed to meet [the employer's] standards," but the employer neither said what those standards were nor how the employees violated the standards. *Id*. Given their vagueness, the employer's comments were nothing but "nonspecific statements lacking a defamatory meaning." *Id*. In contrast, Revenew's statements were specific to the penny and not of the vague nature sometimes held to constitute opinion. (R. at 861-70.)

25

accusations worth as little as 25 percent of what Revenew claimed. (Ex. GG; Ex. OO.) Revenew even concedes that "it would have been easy to let up and say 'nothing is there'" in its audit of PSC. (Ex. PP.) Any of these statements are sufficient on their own to show that Revenew was, at minimum, reckless about the truth of its accusations. *See Fluor Enters., Inc. v. Conex Int'l Corp.*, 273 S.W.3d 426, 439 (Tex. App.—Beaumont 2008, pet. denied) ("Reckless disregard is established by evidence that the defendant in fact entertained serious doubts as to the truth of the statements.").

The evidence of Revenew's reckless or intentional disregard for the truth does not stop there. Revenew abandoned its own "best practice" when selecting the PSC sample sizes, causing Revenew to magnify purported errors by a factor of 90. (Ex. EE.) One of the employees who ordered this slashing of invoice samples admits that she believes 50 was the correct sample size, and Revenew's COO admits that such deviation from best practices was against his expectations. (R. at 956-58, 1001-02.)

It makes no difference that some of Revenew's most damaging admissions came after the audit ended. Revenew suggests the Court cannot consider after-the-fact admissions to determine Revenew's mental state during the audit. App. Br. at 24. If Revenew were correct, then even deposition and trial testimony could never prove malice—simply because any admissions in such testimony are necessarily made long after the disparaging statement at issue. Of course, that is not the law. *See Gonzalez v. Hearst Corp.*, 930 S.W.2d 275, 283 (Tex. App.—Houston [14th Dist.] 1996, no writ)

26

("Refusal to print a retraction is evidence of an action *after* the publication, but it can lend support to a claim that reckless disregard or knowledge existed *at* the time of publication."); *Gaylord*, 7 S.W.3d at 285 (finding malice based on defendant's after-the-fact testimony about what she did before making defamatory statement).[6]

Moreover, Revenew had already received complaints from past customers and audit targets about the same methods used in this audit. (*See* Ex. V, Moore 162:13-165:1.) Despite its knowledge of those complaints, Revenew kept on using the same audit practices, never installing any quality-control mechanisms to determine whether the billing "errors" relayed to Exelon were legitimate. (R. at 946-47.) Bill Shoemaker—who has no legal training, is not an expert in industrial-cleaning contracts like PSC's, and has never worked in the industrial-cleaning sector—found all "errors" on the PSC invoices with no oversight from his supervisor. (R. at 876-878, 946-47.)

Courts routinely infer recklessness from defendants' "improper[] extrapolat[ion] from other evidence" or "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *See Harte-Hanks Commc'ns, Inc. v.*

---

[6]     To support its position, Revenew cites only *Hansen v. Jackson*, No. 13-14-00039-CV, 2014 WL 5794872 (Tex. App.—Corpus Christi Nov. 6, 2014, pet. filed). Nothing in *Hansen* indicates that documents dated after the disparaging statements are off limits when assessing malice. In *Hansen*, defendants recommended firing the plaintiff. Months later, they made disparaging comments about the plaintiff. *Hansen* merely holds that the defendants' earlier desire to fire the plaintiff—by itself—is no proof that they knew their later statements about him were false. *Id. at* *10. How Revenew twists that holding into a rule that "statements . . . made *after* the allegedly false [statement] . . . do not constitute evidence concerning reckless disregard" is a mystery. *See* App. Br. at 24.

*Connaughton*, 491 U.S. 657, 666 (1989); *Gaylord*, 7 S.W.3d at 285 (finding fact issue on malice when reporter misconstrued incomplete data on a judge's entries and exits into the courthouse parking garage). If the facts above are not enough to establish recklessness, it is difficult to imagine any that do. *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 638 (Tex. 2005) ("[I]nherently improbable assertions and statements made on information that is obviously dubious may show actual malice."); *Bentley*, 94 S.W.3d at 591 (holding that sloppy research "contrary to a speaker's usual practice" may demonstrate recklessness to the truth).

### b. Revenew acted with ill will toward PSC and intended to interfere with PSC's economic interests.

Revenew's discussion of ill will and intentional interference is notable for one thing: its dearth of supporting law. App. Br. at 25-26. Rather than attempting to show any entitlement to summary judgment, Revenew merely sets forth a host of jury arguments that lay out alternative inferences one could draw from various evidence. *Id.* Such arguments are immaterial to a no-evidence motion like this one. *See Mensa-Wilmot v. Smith Int'l, Inc.*, 312 S.W.3d 771, 781 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("We review a no-evidence summary judgment by construing the record in the light most favorable to the nonmovant and disregarding all contrary evidence and inferences.").

In any event, evidence abounds concerning Revenew's ill will toward PSC. For instance, Revenew targeted *only* PSC—but none of the other Exelon vendors

that Revenew audited—for specious "extrapolation" techniques. (Ex. S.) Moreover, Revenew viewed PSC as "good juice," a "good pay day," and rejoiced when PSC had to "write that big fat check!" (R. at 924, 981; Ex. QQ.) Revenew also misused confidential information from its past audits of PSC to (1) evaluate whether to audit PSC for Exelon and (2) to pressure PSC into paying more money to Exelon. (R. at 963-68, 989-90.) These facts far exceed the generic evidence of "ill will" that is needed to raise a fact dispute. *See*, *e.g.*, *Stearns v. McManis*, 543 S.W.2d 659, 663 (Tex. Civ. App.—Houston [1st Dist.] 1976, writ dism'd) (finding fact question on "ill will" where defendant said he could not get along with plaintiff and would quit kennel club if plaintiff was admitted).

It is equally clear that Revenew intended to interfere with PSC's economic interests. Revenew ordered the creation of bogus samples to inflate the appearance of overbillings. (*Supra* § IV.C.3.). Throughout the audit, Revenew used a "thermometer" to keep track of the overbillings attributed to PSC, encouraging employees to "get it revved up tomorrow and crank up the thermometer." (Ex. TT.) Revenew was openly awaiting its "good pay day" from PSC, and the high dollar-value of PSC's account with Exelon was among the reasons that Revenew agreed to perform the audit. (R. at R. at 981-82, 990, 992.) In short, Revenew's accusations of false billing had no purpose but to enrich Revenew at the expense of PSC. Such evidence shows an intent to harm PSC's economic interests. *See*, *e.g.*, *Hipsaver, Inc. v. Kiel*, 984 N.E.2d 755,

29

770-71 (Mass. 2013) (citing RESTATEMENT (SECOND) OF TORTS § 623A (1977)) (holding that remarks referring to product as "untested" and manufacturer as "the biggest scam artist" showed an intent to interfere).[7] Consequently, Revenew's no-evidence motion was properly denied.

### 3. Revenew fails to prove its affirmative defense of justification.

Justification is an affirmative defense to tortious interference, and Revenew cannot use the defense to win summary judgment without conclusively proving all elements of justification. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989). Revenew fails to do so.

First, Revenew cannot even claim the defense because Revenew's means of interference amount to independent torts, which are never justified. Next, there exists—at minimum—a factual dispute about whether Revenew was truly acting pursuant to the contract terms that supposedly justified its behavior. Finally, Revenew fails to prove that it acted in good faith when carrying out the audit of PSC.

---

[7]    The business disparagement cause of action in Texas is derived from the "injurious falsehood" claim described in the Second Restatement. Texas, like many jurisdictions, follows this Restatement provision. *See Hurlbut*, 749 S.W.2d at 766 (citing RESTATEMENT (SECOND) OF TORTS § 623A (1977)). Therefore, cases from other jurisdictions applying the same provision offer some guidance on what evidence establishes the four variants of malice.

30

a. **No justification defense is available because Revenew's interference was accomplished by means of independent torts.**

As a threshold matter, no justification defense is available to Revenew because Revenew's means of interfering with the PSC-Exelon contact included independent torts—business disparagement of PSC and fraudulent or negligent misstatements to Exelon. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 81 (Tex. 2000) ("[I]f the plaintiff pleads and proves methods of interference that are tortious in themselves, then the issue of privilege or justification never arises."); (R. at 7-9; *Supra* § IV.B-C.) In other words, there can be no "justification" defense because Revenew interfered using tortious means. *Prudential*, 29 S.W.3d at 81. Interference that is independently tortious is never justified. *Id.*

b. **There is, at minimum, a conflict in evidence about whether Revenew was acting pursuant to its contract with Exelon.**

The only justification that Revenew claims is its right to perform audits under its contract with Exelon. App. Br. at 27-31. Rather than attempting to carry its burden of proving justification as a matter of law, Revenew only claims that "there is no dispute that Revenew was acting pursuant to its own contract with Exelon" when it made the disparaging statements. App. Br. at 29. No dispute?

The Exelon contract does not give Revenew a blank check to conduct audits in whatever way Revenew sees fit. Instead, the contract requires Revenew to perform an audit (1) "of high quality, free from any defects," (2) "in accordance with the

31

applicable state-of-the-art industry standards and practices," and (3) in compliance with "the practices and professional standards used in well-managed operations performing services similar to [the audit]." (Ex. RR, §§ 4.1, 4.2.) Revenew's president admits that Revenew is not acting within its rights under the Exelon contract unless it meets all of these benchmarks. (R. at 843-45.) The evidence proves Revenew did not.

For one, Revenew did not comply with the terms requiring an audit of the highest quality, and thus was not acting within any legal privilege. As described above, Revenew's sampling practices in this audit were far below industry standards and even violated Revenew's own "best practice." (*Supra* § IV.C.) Dr. Cowan has testified, in essence, that Revenew's conduct of this audit was as far from "state-of-the-art" and "professional" as it is possible to be. (R. at 1021.) (concluding that this audit was "completely inconsistent with good statistical practice, and ignores statistical and audit convention").

Revenew's contract further requires a "random sample of invoices" from "the population of invoices covering the 3-year review period." (Ex. RR, REV007901, § B-2-A.) Revenew also violated this provision. According to Revenew's IT director, Revenew's invoice sample was not random. (Ex V, Moore 39:22-41:13.) Moreover, Revenew did not draw the sample from "the population of invoices covering the 3-year review period." Instead, it drew the sample from an artificially restricted pool

32

that excluded 1,342 low-dollar invoices. (*Supra* § IV.C.1.) By defying its contract with Exelon, Revenew cannot claim that same contract as the basis of its justification defense. *See Am. Nat'l Petro. Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 279 (Tex. 1990) ("[Defendant] breached its contract to coerce [Plaintiff and third party] to settle outstanding liability claims. Trying to coerce a party into a favorable settlement by threats under existing…contracts with third parties is *not* privileged."). Just as they show Revenew's lack of compliance with its contract, these facts demonstrate—or at least raise a genuine issue of material fact about—Revenew's lack of justification.[8]

### c. Revenew did not exercise its rights in good faith.

Even if Revenew had identified any text in the Exelon contract that permits Revenew to behave as it did, such text would not entitle Revenew to summary judgment on its affirmative defense of justification. According to Revenew, tortious interference is always justified as a matter of law so long as the defendant can link its actions to some contractual right of its own. App. Br. at 27-31. According to the Texas

---

[8]     Revenew twists this evidence into an argument that PSC, as a non-party to the Revenew-Exelon contract, is trying to sue Exelon for malpractice. *See* App. Br. at 30. Not so. As the party rebutting Revenew's justification defense, PSC merely relies on the Exelon contract to show that Revenew's defense lacks merit. Moreover, it is well-settled that a party *not* in privity with an auditor can sue the auditor for tortious misconduct. *Ernst & Young, LLP v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 575–78 (Tex. 2001); *Ervin v. Mann Frankfort Stein & Lipp CPAs, L.L.P.*, 234 S.W.3d 172, 177 (Tex. App.—San Antonio 2007, no pet.). Revenew's position—that any intentional tort committed behind the façade of an audit cannot give rise to liability to non-clients—is not the law. Taken to its logical conclusion, Revenew's argument would allow it to conduct audits by falsely imprisoning suppliers, assaulting its targets into paying, invading its subjects' privacy, or—as alleged here—disparaging suppliers and interfering with suppliers' customer contracts.

33

Supreme Court, however, no contract allows Revenew—or anyone else—to "say or do anything under the guise of exercising" contractual rights. *Prudential*, 29 S.W.3d at 81. Instead, "the defense of legal justification or excuse only protects *good faith* assertions of legal rights." *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 939 (Tex. 1991) (emphasis added).

The Supreme Court's opinion in *Prudential* demonstrates why Revenew's motion fails as a matter of law. In that case, Prudential contracted with certain hospitals to pay medical bills and enjoyed a contractual right to challenge any bill. 29 S.W.3d at 81. On behalf of those hospitals, a collection agency billed Prudential for hundreds of invoices. *Id*. at 76. Prudential responded with "sham audits" and false accusations against the collection agency. *Id*. at 81. The agency sued Prudential for tortious interference. Despite Prudential's contractual right to challenge any bill, the Supreme Court refused to conclude that Prudential was privileged, as a matter of law, to "say or do anything" in furtherance of that right. *Id.*

The result should be no different here. Instead of simply performing a legitimate audit as its contract with Exelon demands, Revenew took the bad-faith steps of (1) making "gray" accusations, (2) telling Revenew that PSC had billed almost four times as much as Revenew thought was the "fair" estimate of true overbillings, and (3) instructing auditors to intentionally skew the samples, both in terms of size and content, of PSC billings to inflate the purported error rate. (Ex.

34

DD; Ex. NN; Ex. GG.) Under *Prudential*, such evidence presents a fact dispute concerning Revenew's justification defense. 29 S.W.3d at 83.

### 4. Revenew failed to conclusively prove its privilege defense.

Just as justification is an affirmative defense to tortious interference, privilege is an affirmative defense to business disparagement. *See Daystar Residential, Inc. v. Collmer*, 176 S.W.3d 24, 28-29 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); RESTATEMENT (SECOND) OF TORTS § 651(2) (1977) (in business disparagement case, the "defendant has the burden of proving, when the issue is properly raised, that the publication was absolutely or conditionally privileged."). Revenew concedes as much. App. Br. at 31 (calling privilege an "affirmative defense").

PSC and Revenew agree about one thing: "the issue of 'privilege' overlaps with the issues of justification." App. Br. at 32. For the same reasons that Revenew's statements were not justified, they are not privileged. In sum, Revenew asserts—without citing evidence—that "Revenew did exactly what it was retained and entitled to." *Id*. But extensive evidence shows that Revenew did not conform to its contract with Exelon, as by failing to comply with "applicable state-of-the-art industry standards and practices," not completing an audit "free from any defect," and not choosing a "random sample of invoices" from "the population of invoices covering the 3-year review period." (*See supra* § IV.B-C.) These facts destroy Revenew's privilege defense or at least prevent Revenew from

35

conclusively proving its defense. *See Victoria Bank*, 811 S.W.2d at 939 ("[T]he defense of legal justification or excuse only protects good faith assertions of legal rights.").

Revenew relies on the *Calhoun* and *Randall's* opinions, but both are inapposite. (App. Br. 32.) First, the *Calhoun* court merely concluded that credit-reporting agencies enjoy a conditional privilege to share credit reports with banks—so long as the agency acts in "good faith." *See Calhoun v. Chase Manhattan Bank (U.S.A.), N.A.*, 911 S.W.2d 403, 408 (Tex. App.—Houston [1st Dist.] 1995, no pet.). Revenew's work has nothing to do with credit reporting, and there is a substantial dispute of fact about whether Revenew performed its work in "good faith." (*See supra* § VI.B.3.c.) *Randall's* is even further afield. That opinion merely applies a policy-based rule, unique to the employment context, that "[a]ny reasonable employer would investigate" reports of "serious wrongdoings" in the workplace, making such investigations conditionally privileged. *Sw. Bell Tel. Co. v. Dixon*, 575 S.W.2d 596, 599 (Tex. Civ. App.—San Antonio 1978), *writ dism'd w.o.j.*, 607 S.W.2d 240 (Tex. 1980); *see also Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (citing and applying *Dixon*). Neither of

36

those opinions even hints that firms such as Revenew enjoy an absolute privilege to falsify data to complete a vendor-invoice audit.[9]

In sum, PSC established numerous fact issues concerning Revenew's assertion of privilege, and Revenew falls far short of conclusively establishing this affirmative defense as a matter of law.

## CONCLUSION

For the reasons above and in its Motion to Dismiss, PSC asks the Court to dismiss this appeal, to award damages, costs, and attorneys' fees for responding to this frivolous appeal, and to grant PSC any other relief to which it may be justly entitled.

---

[9] Revenew also relies on a federal district court opinion issued 22 years ago. *See Kipp v. LYV Aerospace & Defense*, 838 F. Supp. 289 (N.D. Tex. 1993). In addition to having little persuasive value, *Kipp* turned on a fact missing from this case. The defendant in *Kipp* had "superior" contractual rights to the plaintiff, an at-will employee with no written contract. *Id.* at 295. As a result of its contractual trump card, the defendant was justified in interfering with the plaintiff's at-will employment relationship. *Id.* Revenew has not alleged—and could not allege—any such "superior" right in this case.

37

Respectfully submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING P.C.**

By: */s/ Todd W. Mensing*
Todd W. Mensing
Texas Bar No. 24013156
tmensing@azalaw.com
Adam Milasincic
Texas Bar No. 24079001
amilasincic@azalaw.com
Edward Goolsby
Texas Bar No. 24092436
egoolsby@azalaw.com
1221 McKinney, Suite 3460
Houston, Texas  77010
(713) 655-1101 – Phone
(713) 655-0062 – Fax

**ATTORNEYS FOR APPELLEE,
PSC INDUSTRIAL OUTSOURCING, LP**

## CERTIFICATE OF COMPLIANCE

I certify that this Response complies with the typeface and word-count requirements set forth in the Rules of Appellate Procedure. This Response has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This Response contains 9,250 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Todd W. Mensing*
Todd W. Mensing


## CERTIFICATE OF SERVICE

I certify that on June 12, 2015, a true and correct copy of the above and foregoing document was served upon the following counsel by electronic service through the state-provided EFSP Efile.txcourts.gov:

Lauren J. Harrison
Lara D. Pringle
JONES WALKER LLP
1001 Fannin Street, Suite 2450
Houston, TX 77002

*/s/ Todd W. Mensing*
Todd W. Mensing